Filed 8/5/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059820 |
| v. | (Super.Ct.No. RIF1206972) |
| JOSE RAFAEL CARDENAS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Christian F. Thierbach, Judge. Affirmed as modified.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott Taylor, and Amanda E. Casillas, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Jose Rafael Cardenas guilty of one count of robbery (Pen. Code, § 211;[1] count 1) and three counts of burglary (§ 459; counts 3, 4 & 5). As to counts 1 and 3, the jury found true that defendant had personally inflicted great bodily injury upon a person 70 years of age or older (§ 12022.7, subd. (c)); and that he had burglarized and robbed a person who was 65 years of age or older (§ 667.9, subd. (a)).[2] In a bifurcated proceeding, defendant admitted that he had served three prior prison terms within the meaning of section 667.5, subdivision (b). Defendant was sentenced to a total term of 18 years in state prison with credit of 451 days for time served. On appeal, defendant contends (1) there was insufficient evidence to support the great bodily injury enhancement attached to counts 1 and 3; (2) the trial court erred in imposing sentences on both counts 1 and 3 in violation of section 654; (3) the trial court erred in imposing punishment on the two enhancement allegations attached to count 1; and (4) the trial court erred in calculating his presentence custody credits. For the reasons explained below, we modify defendant's sentence and presentence custody credits and affirm the judgment as modified.

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

[2] The trial court granted defendant's motion for acquittal pursuant to section 1118.1 as to count 2, assault by means of force likely to produce great bodily injury (§ 245, subd. (a)).

I

FACTUAL BACKGROUND

A.      *August 28, 2012 Burglary Offense – Count 5*

In August 2012, Alma Acosta lived across the street from Maria Perez on California Avenue in Riverside. On the morning of August 28, 2012, Acosta observed three males standing in front of Perez's home with a box of beer. She also noticed that Perez's car was not in her driveway where it is usually parked.

Perez had left her home to take her daughters to school. When she returned home at around 7:45 a.m., she saw a man, identified as Aaron Romero, leaving her home carrying a plasma television. Perez followed Romero and called the police. Police officers arrived and took Romero into custody. Perez showed the police officers a beer can and a footprint in her backyard that had not been there prior to the burglary. After examining her home, Perez discovered $2,000 in cash, jewelry, a laptop computer, and other electronics were missing from her home.

That same morning, Perez's neighbors, a 12-year-old boy and his 11-year-old sister, observed defendant holding a laptop bag jump over a fence into their backyard. Defendant asked the boy if he could jump the fence again, and the boy responded "Go for it." Defendant then jumped the fence and went onto the street.

In connection with the burglary, officers investigated a suspicious Cadillac in the area. The officers ran the vehicle's license plate and discovered that defendant owned the Cadillac. An officer later observed a pair of shoes in defendant's closet that matched

footprints found at Perez's home. Detectives also found Perez's husband's driver's license in defendant's trash.

B. *September 12, 2012 Robbery and Burglary Offenses – Counts 1 & 3*

In September 2012, then 86-year-old Verna Senger lived with her daughter and son-in-law, Richard Hengstebeck, on Eileen Way in Riverside.[3] At around 9:00 a.m. on September 12, 2012, Senger was alone and asleep in her bedroom. She later awoke on the hallway floor with her nose bleeding and her night gown "full of blood." Her face was bruised and swollen; and one of her eyes was swollen shut. She had injuries on her face she did not previously have. Senger could not move, and had no memory of the period between when she went to sleep and when she awoke bleeding or how she had sustained her injuries. A walker Senger used for mobility was lying on the floor in the hallway. She had no prior memory loss; her health was fair when she went to sleep; and she had not previously walked around the house and fallen, though she had slid off a couch once.

At some point, Senger observed an unknown Hispanic male wearing a baseball cap stealing items from her home. The male asked her if she had any money or guns in the home. Senger responded, "no." Senger's son-in-law, Hengstebeck, returned home around 11:15 a.m. and as Hengstebeck was unlocking the front door, the male ran out through the master bedroom window, breaking the window screen. Hengstebeck saw Senger sitting up in the hallway injured but coherent, and called 911. Hengstebeck

---

[3] At the time of trial, Senger was 87 years old.

4

noticed the house was in disarray and the dresser drawers in Senger's bedroom had been ransacked.

Riverside Police Officers Christian Franco and George Anderson responded to the home. The officers found Senger "slumped down" and bloody on the floor in the hallway, and her face was bruised and swollen. When Officer Anderson later interviewed Senger at the hospital, Senger had severe bruising on her face and swelling on her mouth and cheek. Senger spent six days in the hospital and suffered bilateral nasal fractures, a left subdural hematoma (a blood clot between the layers of tissues surrounding the brain), and hemorrhaging in her eye. Dr. Peter Wawro, a trauma surgeon, explained that Senger's injuries were likely caused from a strike to her eye, causing a significant amount of "blow" to her cheek. He ruled out the possibility of a spontaneous fracture because "spontaneous fractures, in the absence of cancer, have not really been reported." Although Dr. Wawro admitted that people in Senger's age range do fall and have significant trauma, he opined that Senger's injuries were consistent with the infliction of blunt force trauma to the face, possibly two separate impacts, when falling onto a carpeted floor. Dr. Wawro was unsure whether she had suffered one single injury or several injuries or where she was actually struck on the skull.

Further investigation revealed the presence of shoe prints displaying the letters "DC" outside the master bedroom window. These shoe prints matched the shoe print at the August 28, 2012 burglary; and a pair of "DC" shoes were found in defendant's closet in connection with the investigation of the August 28, 2012 burglary. Police officers also

5

later discovered that defendant sold a gold memorabilia coin belonging to Senger's son-in-law to a Cash for Gold store. A store surveillance video of defendant's transaction at the Cash for Gold store was played for the jury.

C.    *September 12, 2012 Burglary Offense – Count 4*

At approximately 7:30 a.m. on September 12, 2012, Shaun Sapungan left her home on Canterbury Road. When she returned at about 1:40 p.m., she found a bicycle propped up against her front door blocking her entry. As she entered her home, she noticed that her couch cushions had been torn, and her entire home was in disarray. Sapungan's jewelry had been stolen, including her engagement ring, as well as two digital cameras and an iPad. Sapungan also found a Blockbuster video card in the name of Senger's daughter in her home. Senger and her daughter and son-in-law were Sapungan's neighbors. Sapungan also found a pair of gray "DC" shoes that did not belong to anyone living in her home hidden outside near the gate of her house.

When Sapungan went outside to use a neighbor's telephone to call 911, she saw an unfamiliar man emerge from a nearby residence of an elderly couple. The man was wearing clothing and carrying a baseball backpack containing bats that looked similar to items belonging to her son. Sapungan also observed defendant get into a light brown, "goldish," "tannish" color car with "flashy rims" driven by a young female.

Defendant had telephoned his friend Mayra Meregildo and asked her to pick him up as soon as possible on Eileen Street. Defendant owned a Cadillac but it was not mechanically reliable. Meregildo owned a gold Nissan Maxima with chrome rims.

6

When Meregildo picked defendant up, she noticed that defendant was dressed differently than usual; he was dressed up like a baseball player and was carrying a backpack-type bag on his shoulder with a stick or bat hanging out of it. Meregildo transported defendant to a Cash for Gold store where he sold jewelry, including an engagement-style ring, electronics, which included a tablet computer, and a gold coin encased in plastic. Defendant received at least $100 from the sale. An employee at the Cash for Gold store purchased an iPad from defendant.

Defendant lived within walking distance of Senger's and Sapungan's homes. Defendant's fingerprints were found on the bicycle found propped up against Sapungan's front door and on a soda can inside the Sapungan home.

II

DISCUSSION

A.    *Sufficiency of the Evidence*

Defendant contends that there was insufficient evidence to establish beyond a reasonable doubt that he inflicted great bodily injury on Senger. Specifically, he argues that there was no evidence he *personally* inflicted the great bodily injury, because Senger could not identify how she sustained the injuries and Dr. Wawro merely speculated as to the cause of the injuries suffered by Senger. This contention lacks merit.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the

7

defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*); see *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) All conflicts in the evidence and questions of credibility are resolved in favor of the verdict, drawing every reasonable inference the jury could draw from the evidence. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358 (*Autry*).) Reversal on this ground is unwarranted unless " 'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*Bolin*, *supra*, at p. 331.) This standard applies whether direct or circumstantial evidence is involved. (*People v. Catlin* (2001) 26 Cal.4th 81, 139, overruled on another ground in *People v. Nelson* (2008) 43 Cal.4th 1242, 1253-1256.)

" 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 (*Sanghera*).) "Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error. [Citation.] Thus, when a criminal defendant claims on appeal that his conviction was based on insufficient evidence of one or more of the elements of the crime of which he was convicted, we *must* begin with the presumption that the evidence of those elements *was* sufficient, and the defendant bears the burden of convincing us otherwise. To meet that burden, it is not enough for the defendant to

8

simply contend, 'without a statement or analysis of the evidence, . . . that the evidence is insufficient to support the judgment[] of conviction.' [Citation.] Rather, he must *affirmatively demonstrate* that the evidence is insufficient." (*Ibid*.)

Under section 12022.7, subdivision (c), "[a]ny person who personally inflicts great bodily injury on a person who is 70 years of age or older, other than an accomplice, in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for five years." Great bodily injury simply means " 'significant or substantial physical injury.' " (*People v. Cross* (2008) 45 Cal.4th 58, 63 (*Cross*).) Whether a victim has suffered great bodily injury is for the jury to decide. (*Id*. at p. 64.) To be significant the injury need not be so grave as to cause the victim permanent, prolonged or protracted bodily damage. (*Ibid*.) Defendant does not dispute that Senger suffered great bodily injury or that she was 70 years of age or older at the time she was injured. Rather, defendant's claim on appeal is that there was insufficient evidence to prove he *personally* inflicted Senger's injuries.

Interpreting the meaning of the term "personally inflicts" in section 12022.7, subdivision (a), an enhancement with language identical to that contained in subdivision (c) of section 12022.7, our Supreme Court in *Cross, supra,* 45 Cal.4th 58 stated, "Commonly understood, the phrase 'personally inflicts' means that someone 'in person' (Webster's 7th New Collegiate Dict. (1970) p. 630), that is, directly and not through an intermediary, 'cause[s] something (damaging or painful) to be endured.' " (*Id*. at p. 68; see *People v. Cole* (1982) 31 Cal.3d 568, 579 (*Cole*) [Supreme Court

9

"conclude[d] that in enacting section 12022.7, the Legislature intended the designation 'personally' to limit the category of persons subject to the enhancement to those who directly perform the act that causes the physical injury to the victim"].)

Case law has construed *Cole* and *Cross* to mean that "for the [great bodily injury] enhancement to apply, the defendant must be the direct, rather than proximate, cause of the victim's injuries." (*People v. Warwick* (2010) 182 Cal.App.4th 788, 793, italics omitted; see *People v. Valenzuela* (2010) 191 Cal.App.4th 316, 321 ["Case law establishes that proof a defendant proximately caused great bodily injury does not constitute proof the defendant personally inflicted such injury"]; *People v. Rodriguez* (1999) 69 Cal.App.4th 341, 349 ["To 'personally inflict' injury, the actor must do more than take some direct action which proximately causes injury"].)

Defendant's argument that the record contains no evidence he directly caused Senger's injuries misfocuses on the evidence favorable to his position. Our task in reviewing for sufficiency of the evidence, however, is to consider the evidence favorable to the jury's verdict. That evidence showed that before defendant's unlawful intrusion into her home, Senger went to sleep in fair health with no injuries to her face. When she awoke, she was severely injured, and saw defendant burglarizing her home. Senger had never suffered memory loss and had not previously fallen while walking. Senger's injuries were inconsistent to what would be expected had she fallen onto a carpeted floor or the result of a spontaneous bone fracture. Dr. Wawro explained that Senger's injuries were likely caused from a strike to her eye, causing a significant amount of blow to her

10

cheek, and ruled out the possibility of a spontaneous fracture. Although Dr. Wawro admitted that people in Senger's age do fall and may suffer significant trauma, he opined that Senger's injuries were consistent with the infliction of blunt force trauma to the face, possibly two separate impacts. Senger suffered multiple facial bone fractures and bleeding in her brain and eye. And, prior to her son-in-law's arrival, defendant was alone with Senger. Circumstantial evidence supports the jury's finding that defendant personally inflicted great bodily injury on Senger.

Defendant's arguments to the contrary were credibility issues to be resolved by the jury. (*Autry*, *supra*, 37 Cal.App.4th at p. 358.) And, as previously noted, we must accept logical inferences that the jury might have drawn from the circumstantial evidence. (*Sanghera*, *supra*, 139 Cal.App.4th at p. 1573.) The evidence here was sufficient to sustain the great bodily injury allegation.

B.      *Section 654 on Counts 1 & 3*

Defendant also argues that the trial court erred in failing to stay his sentence on count 3 (burglary of Senger's home) pursuant to section 654, because he had a single criminal intent and objective when he robbed Senger at her home (count 1) and burglarized her home (count 3). The People respond that the trial court properly sentenced defendant to consecutive terms on counts 1 and 3 because defendant's offenses fell within the multiple victims exception to section 654.

Section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the

11

longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  The purpose of the statute "is to ensure that a defendant's punishment is commensurate with his culpability and that he is not punished more than once for what is essentially one criminal act."  (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252 (*Kwok*).)

Section 654 precludes multiple punishment for a single act or omission or for an indivisible course of conduct.  (*People v. DeLoza* (1998) 18 Cal.4th 585, 591 (*DeLoza*).)  " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'  (*Neal v. State of California* [(1960)] 55 Cal.2d [11], 19.)"  (*Kwok*, *supra*, 63 Cal.App.4th at p. 1253.)  "Whether the acts of which a defendant has been convicted constitute an indivisible course of conduct is a question of fact for the trial court, and the trial court's findings [whether express or implied] will not be disturbed on appeal if they are supported by substantial evidence."  (*Id.* at pp. 1252-1253.)

Defendant asserts that he could not be punished for both the robbery of Senger and the burglary of the house Senger resided in because both offenses were committed with the single intent and objective of stealing items from the home.  (*People v. Le* (2006) 136 Cal.App.4th 925, 931; *People v. Smith* (1985) 163 Cal.App.3d 908, 912.)  The People do not argue otherwise regarding defendant's intent, but, relying on this court's opinion in

12

*People v. Centers* (1999) 73 Cal.App.4th 84 [Fourth Dist., Div. Two] (*Centers*), maintain section 654 should not apply because defendant committed crimes of violence against two people, as Hengstebeck entered the home and was present during the time of the offenses.

Our Supreme Court has held that section 654 does not prohibit multiple punishments where the defendant's single objective during an indivisible course of conduct results in crimes of violence against multiple victims. (*People v. Miller* (1977) 18 Cal.3d 873, 885 (*Miller*), overruled on other grounds as stated in *People v. Oates* (2004) 32 Cal.4th 1048, 1067, fn. 8; *DeLoza*, *supra*, 18 Cal.4th at p. 592.)

Under the multiple victim exception, " ' "even though a defendant entertains but a single principal objective during an indivisible course of conduct, he [or she] may be convicted and punished for each crime of violence committed against a different victim." [Citations.]' " (*Centers*, *supra*, 73 Cal.App.4th at p. 99.) "The robbery of a victim at gunpoint has been held to be an act of violence such as to preclude application of section 654 in the case of multiple convictions involving multiple victims." (*Miller*, at p. 886; accord, *People v. Champion* (1995) 9 Cal.4th 879, 934-935.) Burglary may also be treated as a crime of violence when the defendant personally used a firearm in committing the offense. (*Centers*, *supra*, 73 Cal.App.4th at p. 99.) To preclude application of section 654, however, each of the crimes must have involved at least one different victim. (*Centers, supra*, at p. 102; *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1784-1785 [Fourth Dist., Div. Two]; *Miller*, at p. 886, fn. 11.)

13

In *Miller*, *supra*, 18 Cal.3d 873, for example, the defendant entered a store occupied by a salesman and a security guard and took jewelry at gunpoint, shooting the guard in the process. The defendant was convicted of burglary and robbery. The Supreme Court acknowledged that the defendant "entertained but a single criminal objective—to commit a theft of the contents of the jewelry store . . . ." (*Id*. at p. 885.) However, the court held the defendant could be separately punished for the burglary and the robbery under the multiple victim exception.

The court reasoned that although a burglary "does not necessarily involve an act of violence against any person" (*Miller*, *supra*, 18 Cal.3d at p. 886), the burglary was a violent crime for section 654 purposes, because the jury found the defendant inflicted great bodily injury on the security guard. (*Miller*, at p. 882.) In addition, the robbery was a violent crime against the salesman and the defendant had used a gun to perpetuate both offenses. Since there were two separate crimes of violence against two separate victims, section 654 did not apply. (*Miller*, at p. 886.)

In *Centers*, *supra*, 73 Cal.App.4th 84, this court applied the reasoning of *Miller* to a case in which, unlike the present case, the defendant used a gun to enter a residence and then kidnapped one of several occupants. (*Centers*, at pp. 88-89, 99.) We held that although burglary "standing alone" is not a violent crime (*id*. at p. 99), "burglary is a violent crime for purposes of the 'multiple victim' exception when the jury finds that, in the commission of the burglary, the defendant personally used a firearm." (*Id*. at p. 88.) We concluded that since at least one of the occupants who was a victim of the burglary

14

was not a victim of the kidnapping, the burglary and the kidnapping were two violent crimes against two different victims. Therefore, the multiple victim exception applied, and the defendant was properly sentenced to separate terms for the burglary and the kidnapping. (*Id*. at pp. 101-102.)

This court in *Centers* explained: "the trial court's implied finding of multiple victims is supported by substantial evidence. Indeed, defendant does not argue otherwise. Raines was indubitably the victim of the kidnapping. Grundman was the victim (or at least a victim) of the burglary, because she lived in the home. [Citation.] Grundman also was a victim of defendant's menacing display of a firearm during the burglary. It could be argued that Raines, too, was a victim of the burglary and the personal firearm use. Nevertheless, there was at least one victim of the burglary and the personal firearm use who was not also a victim of the kidnapping. This was sufficient." (*Centers*, *supra*, 73 Cal.App.4th at pp. 101-102.)

Finally, in *People v. Robinson* (1988) 198 Cal.App.3d 674 (*Robinson*), the defendant entered a motel room and assaulted the four occupants. (*Id*. at p. 676.) He contended section 654 precluded separate punishment for the burglary and two counts of assault. (*Robinson*, at p. 678.) Though the People conceded the crimes were parts of an indivisible course of conduct, the court held the multiple victim exception applied, because the jury had found true allegations that in committing the burglary, the defendant inflicted great bodily injury on the victims. Therefore, "the burglary was a crime of violence." (*Id*. at p. 681.)

Here, unlike *Miller*, *Centers*, and *Robinson*, there was no jury finding of great bodily injury or firearm use in the case of Hengstebeck. The record shows that defendant fled as Hengstebeck was unlocking the front door. The information included a great bodily injury allegation on the burglary count (count 3) pursuant to section 12022.7, but the allegation was as to Senger. The allegations on the robbery count (count 1) and the attendant great bodily injury enhancement were also as to Senger. Assuming Hengstebeck was present during the offenses, there were two violent crimes against one victim.[4] Accordingly, this case does not fall within the holdings of *Miller*, *Centers*, or *Robinson*, nor are we aware of any other decision finding burglary to be a crime of violence for purposes of the multiple victim exception without an allegation or finding by the trier of fact to support that characterization.

We did state in *Centers* that "[o]rdinarily, in determining whether Penal Code section 654 applies, the trial court is entitled to make any necessary factual findings not already made by the jury. [Citation.]" (*Centers*, *supra*, 73 Cal.App.4th at p. 101.) However, we made that statement in support of our holding that the trial court could properly find the burglary was committed against multiple victims, even though the identities of the victims were not alleged in the information or found by the jury. (*Ibid*.) We did not say or imply that a court's authority to make factual findings should permit it

---

[4] An examination of the record demonstrates that the evidence is insufficient to show that Hengstebeck was even present at the time of the offenses. Senger testified that as Hengstebeck was unlocking the front door, defendant fled through the master bedroom window.

16

to treat an ordinarily nonviolent crime as a crime of violence by relying on a fact that, though shown by the evidence, is not stated in the information and has not been found true by the trier of fact. In *Centers*, that issue was not presented because, as stated, the jury found firearm use. Here, assuming Hengstebeck was present before defendant fled, he was not a victim of any violent crime. Defendant was not armed when he entered the home nor did he inflict any great bodily injury on Hengstebeck.

In addition, although the courts in *Miller*, *Centers*, and *Robinson* did not expressly state that an allegation and jury finding are always required, in each decision the court did expressly base its holding on the jury's finding of great bodily injury or gun use. (*Miller*, *supra*, 18 Cal.3d at p. 886 ["the burglary *alleged*, *proved* and *found to be true* is a crime of violence" against the victim, italics added]; *Centers*, *supra*, 73 Cal.App.4th at p. 99 [burglary may be treated as a violent crime "when there is a *finding* that the defendant personally used a firearm in the commission of the burglary" against the victim, italics added]; *Robinson*, *supra*, 198 Cal.App.3d at p. 681["[t]he crucial factor here, as in *Miller*, is that the information *charged* and the jury *found*, that defendant committed a violent act upon an individual in the commission of the burglary" against the victim, italics added, fn. omitted].)

Numerous other courts have emphasized the statutory definition of a crime in determining whether the crime can be treated as a crime of violence for purposes of section 654. In *People v. Hall* (2000) 83 Cal.App.4th 1084 (*Hall*), for example, the court said that "whether a crime constitutes an act of violence that qualifies for the multiple-

17

victim exception to section 654 depends upon whether the crime (in conjunction with any allegations in enhancement) is *defined* to proscribe an act of violence against the person." (*Id*. at p. 1092, italics added; accord, *People v. Solis* (2001) 90 Cal.App.4th 1002, 1023 (*Solis*); *People v. Martin* (2005) 133 Cal.App.4th 776, 782.)

Here, of course, burglary is not defined in section 459 "in terms of an act of violence against a person." (*Hall*, *supra*, 83 Cal.App.4th at p. 1092.) When a particular burglary is considered "in conjunction with any allegations in enhancement" (*ibid*.), it may become an offense that is defined in such terms. However, this can occur only where the fact that makes the burglary a crime of violence—e.g., great bodily injury or gun use—"has been charged and proved . . . ." against the person. (§ 667.5, subd. (c)(8) [defining "violent felony" for purposes of sentence enhancement for prior prison terms].)

While we recognize that "section 654 is not a sentencing 'enhancement' " (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 270; accord, *Solis*, *supra*, 90 Cal.App.4th at p. 1022), a finding that section 654 is not applicable may still have a deleterious effect on the defendant's sentence since he may end up serving more time than he would if section 654 were applied. It would not be prudent in light of that fact to extend the multiple victim exception to a case in which the fact that makes the exception applicable was not alleged in the information, was not submitted to the trier of fact, and did not become an issue in the case until after the conclusion of the trial.

Counts 1 (robbery) and 3 (burglary) and the attendant great bodily injury (§ 12022.7, subd. (a)) and age (§ 667.9, subd. (a)) enhancements were based on the same

conduct against the same victim (Senger). Therefore, we decline to apply the multiple victim exception to count 3. Sentence on count 3 should have been stayed pursuant to section 654.

C.    *Punishment on Enhancement Allegations Attached to Count 1*

Defendant further alleges that the section 12022.7, subdivision (c) enhancement subsumed the section 667.9, subdivision (a) enhancement, and that section 654 bars multiple punishments for the single incident of robbing one elderly victim. We disagree.

When section 667.9 was added to the Penal Code, the Legislature wrote in the introductory language, "It is the intent of the Legislature that the enhancements provided in Sections 12022.7 and 12022.8 *shall be imposed in addition* to any enhancement provided in Section 667.9 or 667.10." (Stats. 1985, ch. 1086, § 1; italics added.) As it was the Legislature's intent that both enhancements could be imposed, we conclude that the trial court properly imposed both the one-year age enhancement pursuant to section 667.9, subdivision (a), and the five-year great bodily injury enhancement under section 12022.7, subdivision (c).

D.    *Presentence Custody Credits*

Finally, defendant argues that the trial court miscalculated his presentence custody credits, and claims he is entitled to an additional two days of custody credits. The People agree the court miscalculated his presentence credits but claim the court awarded defendant too many credits, and that his credits should be reduced by four days.

19

At the October 7, 2013 sentencing hearing, the trial court awarded defendant 393 days for actual time served, plus 58 days for conduct credits pursuant to section 2933.1, which limits conduct credits to a maximum of 15 percent of the actual period of presentence confinement for specified violent felonies, for a total of 451 days of presentence custody credits. The probation report noted that defendant was entitled to a total of 425 days of presentence custody credits. The probation officer indicated that defendant had been in custody from August 28, 2012 (date of defendant's arrest for the burglary alleged in count 5) through September 1, 2012, when he was released on bail, and then again from September 14, 2012 (date of defendant's arrest for the offenses alleged in counts 1, 3 & 4) through September 13, 2013 (date of sentencing). The sentencing hearing, however, did not occur until October 7, 2013. As such, the trial court recalculated defendant's credits to include the time up to and including October 7, 2013, an additional 23 days for actual custody plus three days for conduct credits, for a total of 26 additional days.

The parties agree that under section 2933.1, defendant was able to earn only 15 percent conduct credits. (See *In re Reeves* (2005) 35 Cal.4th 765, 780.) Defendant maintains the trial court mathematically erred in calculating his presentence credits, and asserts he is entitled to two additional days as follows: 394 days (five days from August 28, 2012 through September 1, 2012, plus 389 days from September 14, 2012 through October 7, 2013) x .15 (15 percent conduct credits) or 59 days of conduct credits, for a total of 453 days.

The People, however, argue that defendant was not arrested in the instant matter until September 14, 2012, and therefore his presentence custody credits should be reduced to 447 days (389 days for actual time served plus 58 days for conduct credits). The People base this assertion on the trial court's comments at the sentencing hearing, citing to unrelated cases, case Nos. RIF1204496, RIM1210498, and RIF1105156. The court ordered defendant's sentence in case No. RIF1204496 to be served concurrently with his sentence in this case, and the court dismissed case No. RIF1105156, a violation of a probation case, pursuant to the negotiated plea. The People's claim that defendant's period of custody from August 28, 2012 through September 1, 2012 "may have been related to one of [defendant's] other than pending criminal cases" is based on speculation. There is nothing in this record to support this position other than conjecture. There is nothing in the record to foreclose the possibility that defendant suffered an arrest following the August 28, 2012 burglary and then posted bail on September 1, 2012, as reported by the probation officer. On appeal, we presume the probation officer fully and fairly performed the statutory duty imposed on her under section 1203 to correctly chronicle the dates that defendant was in custody in the instant matter. (*People v. Rosenberg* (1963) 212 Cal.App.2d 773, 777; *People v. Valdivia* (1960) 182 Cal.App.2d 145, 148; § 1203.)

Fundamental fairness demands that such reports be founded on accurate and reliable information. (*People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 719, overruled on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 33.) Thus, a party is entitled to

21

respond to adverse information in a probation report, or information that is inaccurate, insufficient or based on unreliable information. (*People v. Arbuckle* (1978) 22 Cal.3d 749, 753; *People v. Bloom* (1983) 142 Cal.App.3d 310, 320.) Here, at the sentencing hearing when the trial court was relying on the dates in the probation report to award defendant presentence custody credits, the People made no challenge to the accuracy of the dates reported by the probation officer. Accordingly, we reject the People's claim that defendant is not entitled to the five days from August 28, 2012 through September 1, 2012, in calculating defendant's presentence custody credits.

"A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered. [Citation.]" (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647; see *People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 8 ["The failure to award an adequate amount of credits is a jurisdictional error which may be raised at any time"].) Based on the dates reported by the probation officer, defendant was arrested in the instant matter on August 28, 2012, released on bail on September 1, 2012, and then arrested again on September 14, 2012, and sentenced on October 7, 2013. For this period of time, he was entitled to 394 actual days of presentence custody credit, not 393 days as found by the trial court. (See *People v. Morgain* (2009) 177 Cal.App.4th 454, 469 ["defendant is entitled to credit for the date of his arrest and the date of sentencing"]; *People v. Browning* (1991) 233 Cal.App.3d 1410, 1412 [day of sentencing counted for presentence custody credits even though it was only partial day].) In addition, he was entitled to accrue 15 percent of those actual days as conduct credit under

section 2933.1. Fifteen percent of 394 is 59.1 days (or 59 rounded to whole number), for a total of 453 days presentence custody credit. We will order the judgment modified to correct this error.

III

DISPOSITION

The judgment is ordered modified to reflect that defendant's sentence on count 3 for residential burglary is stayed pursuant to section 654. The judgment is also modified to reflect that defendant is entitled to one additional day of actual presentence custody credit, along with 59 days of conduct credit, for a total of 453 days of presentence custody credit. The clerk of the superior court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment reflecting these modifications.

As so modified, the judgment is affirmed.

CERTIFIED FOR PUBLICATION

RAMIREZ_____

P. J.

We concur:


McKINSTER_____

J.



KING_____

J.

23