Filed 11/9/21 P. v. Peterson CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | E074793(MF) & E075531 |
| Plaintiff and Respondent, | |
| v. | (Super.Ct.Nos. RIF1703193, RIF1904529) |
| DEBORAH ANN PETERSON, | |
| Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of Riverside County. John D. Molloy, Judge. Reversed and remanded.

Kevin J. Lindsley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Britton B. Lacy, and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

After a bench trial at which the prosecution presented evidence that Deborah Ann Peterson put benzodiazepine (commonly known as Valium or Xanax) into her mother's oatmeal, Superior Court Judge John D. Molloy found her guilty of poisoning, elder abuse likely to produce great bodily injury, dissuading a witness, and assault with a deadly weapon, and sentenced her to a total of nine years in prison. On appeal, Peterson argues there was insufficient evidence to support the poisoning and assault convictions because the record contains no evidence of what constitutes a harmful amount of the drug as well as no evidence of how much of the drug she put in her mother's food.

Peterson's argument is well taken. The substantial evidence standard of review is deferential to the fact-finder's credibility determinations, but that deference doesn't come into play when there is simply no evidence on a crucial aspect of the case. Whether a common drug like benzodiazepine was used as a poison and as a deadly weapon depends entirely upon the amount administered, and there is no evidence from which we can infer Peterson put a potentially deadly or harmful amount in her mother's food. We therefore reverse her convictions on those two counts and remand for resentencing.

## I. FACTS

In September 2019, Peterson and her approximately 55-year-old sister, Renee, were living at the home of their 89-year-old mother, Maryann. Maryann used a walker to move around and took medication for her heart and her arthritis. Peterson helped with Maryann's care by cooking, cleaning, and assisting with other various day-to-day tasks. Another sister, Sandra, drove the mother to her health care appointments and

was responsible for administering her medications. Maryann's home had a surveillance system—installed so the family could keep watch on her late husband in his old age—which recorded audio and video and streamed footage live over the internet.

On the morning of September 23, as Peterson was making oatmeal for Maryann's breakfast, Renee saw her sprinkle something into the bowl. Maryann commented that the oatmeal tasted funny but finished it anyway. Not long after, Peterson's brother texted Sandra asking why their mother was asleep at the table. Sandra checked the cameras and saw her mother was indeed slumped over the table, apparently fast asleep. This struck the siblings as odd because Maryann didn't usually nap during the day. Sandra rewound and watched earlier footage and saw Peterson walk by without checking on Maryann a number of times (a detective who reviewed the footage later testified he saw Peterson walk by Maryann and ignore her a total of 36 times).

When the brother called the house, Peterson hung up on him. Sandra called next and asked to speak with Maryann, but Peterson said she was visiting the neighbor and couldn't come to the phone. Sandra hung up and called 911. As she continued to monitor the live feed, she saw Peterson still ignoring Maryann asleep at the table.

Peterson did not come to the door when the paramedics arrived. As they contemplated forcing their way in, the defendant and Renee finally answered. The paramedics woke Maryann with smelling salts, and she told them she was fine and didn't need go to the hospital. Sandra noticed Maryann was slurring her words and not making sense, so she encouraged her to get additional medical attention, and Maryann ultimately

3

acquiesced. Later, after these events were over, Maryann couldn't remember anything that happened between eating her oatmeal and coming home from the hospital.

According to Sandra and Renee, Maryann still seemed high or out of it when they saw her at the hospital. She was talking in a high-pitched voice and kept asking why she was in the hospital. Sandra insisted on a urine test, which came out positive for benzodiazepine.

When Maryann got home from the hospital that evening, Sandra and Renee sat her down on the couch, placed her walker next to her, and told her not to move. A few minutes later, Maryann stood up and fell (something the siblings said she didn't have a history of doing). When Sandra found her, she had a gash on her shin, so Sandra took her back to the hospital. The cut did not heal well, and Maryann was still being treated for it four months later, at the time of trial.

In October of that year, about a month after the oatmeal incident, Peterson threatened Maryann and told her, "You're not calling anybody," when Maryann said she was going to call Peterson's probation officer. Two days later, Peterson told Maryann and Renee that "[i]f anybody calls the police I personally will kill them."

On October 31, 2019, the Riverside County District Attorney filed a petition alleging Peterson violated probation. The next month, the district attorney charged Peterson with poisoning (Pen. Code, § 347, subd. (a)(1); count 1), elder abuse likely to produce great bodily injury (Pen. Code § 368, subd. (b)(1); count 2), dissuading a witness from reporting a crime (Pen. Code § 136.1, subd. (c)(1; count 3), and assault with a

4

deadly weapon. (Pen. Code § 245, subd. (a)(1), count 4, unlabeled statutory citations refer to this code.) The information also alleged Peterson personally inflicted great bodily injury on a victim 70 years old or older. (§§ 12022.7, subd. (c), 1192.7, subd. (c)(8).)

Peterson waived her right to a jury and proceeded to a bench trial. The prosecution called a Riverside detective to testify about his experience with benzodiazepines. The detective said he used to work in the drug unit and his primary experience with benzodiazepines was with their use as a street narcotic. He said benzodiazepines are used in the medical community to treat anxiety and are found in prescription medications such as Xanax, Valium, and Klonopin, but some people take them recreationally, to make them feel high or "loopy." He said that, based on his own research, elderly people should not be prescribed benzodiazepines (precisely because they can make you feel loopy). His review of Maryann's medical records confirmed she had never been prescribed benzodiazepines.

Before rendering his verdict, the trial judge expressed concern over the state of the evidence. He said he was troubled by the fact the prosecution had not presented sufficient evidence regarding benzodiazepines in general (such as their effects, what constitutes a recommended dosage, and what constitute a lethal one). Also worrisome was the lack of evidence of how much of the drug Peterson had administered to Maryann.

Appearing exasperated, the judge told the prosecution, "I do not have the benefit of a doctor. I do not know what the pharmacokinetics of benzodiazepines are. The best I have is an officer who indicates . . . that he is familiar with benzodiazepines and that

they are not typically prescribed to elderly folks. . . . I don't know what the LD is for it, would be, which would be lethal dose. I don't know what the therapeutic dose was. I don't know how much was in her system. I don't know what its half-life is in her urine. I don't know whether benzodiazepines would cause the symptomology that I'm seeing. . . . [¶] . . . When you say benzodiazepines, I couldn't tell you if it was a stimulant or a depressant. I don't know whether the symptomology displayed by the victim in this case is consistent with an overdose of benzodiazepines. I don't know whether it's consistent with a therapeutic dose of benzodiazepines." In addition the court had "problems finding that [the mother's] fall was a result of an overdose. I don't know whether she had an overdose." In short the court said, "[m]y biggest problem is an understanding of what benzodiazepines can do. I suspect [the prosecution is] probably right. But I don't have anything that tells me that."

Despite these reservations, the judge concluded Peterson was guilty of poisoning and assault with a deadly weapon. The judge found her guilty on the other counts as well but found not true the great bodily injury enhancement. Additionally, the judge found Peterson had violated her probation and revoked it.

The judge sentenced Peterson to a total of nine years in prison, consisting of five years for the poisoning conviction, a consecutive three-year sentence for dissuading a witness, and a consecutive one-year term (one-third the midterm) for the probation violation. He stayed the punishment for the assault with a deadly weapon and elder abuse convictions under section 654. As for fines and fees, in case E075531/RIF1904529 the

judge imposed a $300 restitution fine, $160 in court operations assessments, and $120 in criminal conviction assessments. In case E074793/RIF1703193 he imposed an additional $300 restitution fine, a $40 court operations assessment, and a $30 criminal conviction assessment.

Peterson timely appealed both the revocation of probation and the criminal convictions.[1]

## II. ANALYSIS

Peterson raises the following three arguments on appeal: (1) there is insufficient evidence to support her convictions for poisoning and assault with a deadly weapon; (2) the judge misconstrued the law when he concluded a consecutive sentence for the dissuading a witness conviction was mandatory; and (3) the judge violated her due process rights under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 by imposing certain fines and fees without determining whether she had the ability to pay them.

We conclude there is insufficient evidence to support her two convictions and we must remand for resentencing, which moots any sentencing errors.

When reviewing a sufficiency of the evidence claim, we must determine " ' "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738-739; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) We view the evidence in a light most favorable to

---

[1] Peterson's appeals in both cases (E074793, E075531) are consolidated here. However, because Peterson doesn't challenge the revocation of probation on its own, we limited the above summary of the factual background and procedural history to the second case (E075531).

the judgment and "resolve all evidentiary conflicts and questions of credibility 'in favor of the verdict.' " (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014, quoting *People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.) We may not reverse the judgment "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331, quoting *People v. Redmond* (1969) 71 Cal.2d 745, 755.)

A.     *Poisoning*

Peterson argues the record is insufficient to support a finding that she used the benzodiazepine as a poison because there was no evidence of how much of the drug she added to Maryann's food nor was Maryann's reaction to it sufficient to infer that the amount rose to poisonous or seriously harmful levels. The People concede that benzodiazepines "do not constitute poison per se," but they argue "the way they were used in this case" makes them so. We agree with Peterson.

As relevant here, a person is guilty of poisoning under section 347 if they "willfully mingle[] any poison or harmful substance with any food, drink, medicine, or pharmaceutical product . . . where the person knows or should have known that the same would be taken by any human being to his or her injury." (§ 347, subd. (a)(1).) The statute does not define "poison" or "harmful substance," nor is there a model jury instruction for this offense providing guidance on the terms. However, for purposes of murder by poison (§ 190.2, subd. (a)(19)), our Supreme Court approved of a definition of the term that includes " 'any substance which, when applied to the body externally, or in

8

any way introduced into the system, without acting mechanically, but by its own inherent qualities, is capable of destroying life.' " (*People v. Van Deeler* (1878) 53 Cal. 147, 148 (*Van Deeler*).) In accepting this definition, the court acknowledged poison is a difficult term to define and "proximate accuracy" in the definition would have to be sufficient. (*Id.* at p. 148.)

Even if we adopted this definition for our purposes, it wouldn't be the end of our legal standard analysis. The reason for this is twofold. First, while the definition of poison for murder by poison requires a substance be "capable of destroying life," section 347 only requires that it cause *injury* when consumed by another person. (§ 347, subd. (a)(1).) Additionally, section 347 also applies to the administration of a "harmful substance," which must mean something other than poison if the Legislature included it in the statute following a disjunctive conjunction like "or." Nevertheless, this definition does help outline what kind of substances California law considers poisonous by limiting it to any substance which "without acting mechanically, but by its own inherent qualities," works to cause injury. (*Van Deeler*, *supra*, 53 Cal. at p. 149.) Moreover, it acknowledges that whether a given substance is poisonous is a highly contextual and fact-specific question.

This interpretation is consistent with the scientific understanding of a poison. "[A] fundamental tenet of toxicology is that the 'dose makes the poison' and that all chemical agents, including water, are harmful if consumed in large quantities, while even the most toxic substances are harmless in minute quantities." (*Mancuso v. Consolidated Edison*

9

*Co. of New York*, *Inc.* (1999) 56 F.Supp.2d 391, 403, citing Federal Judicial Center: Reference Manual on Scientific Evidence, Second Edition, "Reference Guide on Toxicology," at 185, 2004 WL 48156, 2 ["There are three central tenets of toxicology. First, 'the dose makes the poison'; this implies that all chemical agents are intrinsically hazardous—whether they cause harm is only a question of dose."].) In other words, there are no inherent, per se poisons; what makes a substance poisonous is its dose and application.

As a result, proving a given substance is poisonous or harmful requires more than simply proving it *can* be harmful or hazardous under certain circumstances. For something to be poisonous or harmful it must be proven harmful in the specific circumstances, in the specific quantities, and in the specific ways in which it is used. This is the difference between potentiality and actuality. (See *In re B.M.* (2018) 6 Cal.5th 528, 535 (*B.M.*) [noting that in the context of determining whether an object was used as a deadly weapon, "it is inappropriate to consider how the object could have been used as opposed to how it was actually used"].)

It follows that the trial judge's concerns about the state of the evidence in this case were well founded. As he observed, the prosecution failed to present evidence on a number of important questions, such as: what constitutes a *lethal* dose of benzodiazepine for someone in Maryann's position (i.e., an 89-year-old woman on heart and arthritis medication but otherwise healthy), what constitutes a *therapeutic* dose, and how much Peterson administered. Without this information it was impossible for the judge to know

what range of doses might have been poisonous or harmful (i.e., injurious), place the dose

Peterson used on that spectrum, and conclude Peterson had used the benzodiazepine as a

poison or a harmful substance. The judge was certainly correct that "prescribed

medications, all of them *can be* dangerous." (Italics added.) His error was failing to hold

the prosecution to their burden of proving beyond a reasonable doubt that the prescription

medication in this case *actually was injurious as used*.

As evidence Peterson administered a poisonous or harmful dose, the People point

to Maryann's behavior on the drug and the detective's testimony that it was consistent

with the drug's side effects. They argue that because the dose Peterson administered was

high enough to produce dizziness, sleepiness, and disorientation in Maryann, it must have

been a harmful amount. But dizziness, sleepiness, and disorientation are common side

effects of therapeutic doses of the drug, not poisonous or harmful doses. Indeed, it is

because of these common side effects that the detective said benzodiazepines shouldn't

be prescribed to elderly people. As the judge acknowledged, "I don't know whether the

symptomology displayed by the victim in this case is consistent with an overdose of

benzodiazepines. I don't know whether it's consistent with a therapeutic dose of

benzodiazepines."

Additionally, we disagree with the People that the detective's opinion that

benzodiazepines shouldn't be prescribed to elderly people can save the conviction. That

testimony was problematic for multiple reasons. First of all, there are the obvious

foundation issues that arise when a nonmedical expert offers a medical opinion. Second,

11

the detective was simply expressing his personal view that elderly people shouldn't take the drug. He did not say whether he knew if physicians actually do prescribe benzodiazepines to elderly people.[2] Third and most importantly, we return to the fact we have no way of knowing what dose was administered in this case. Even if we accept the detective's testimony that elderly people shouldn't take benzodiazepines, there is no evidence the amount Maryann consumed was poisonous or harmful such that it caused her injury.

Simply put, on this record there is no evidence to infer Maryann's symptoms were consistent with an overdose, let alone evidence of how much of an overdose is necessary to produce harmful and injurious results. While the evidence presented amply supports a finding that Peterson *drugged* her mother with benzodiazepine, it doesn't provide a basis for concluding Peterson used the benzodiazepine as a "poison or harmful substance" within the meaning of section 347.

Even if we assume the benzodiazepine was a poison or harmful substance as used in this case, there is insufficient evidence Maryann was injured or Peterson "knew or should have known" administering the drug to Maryanne would result in injury. The statute requires the defendant must have "know[n] or should have known that the

---

[2] We note that Peterson offers a number of compelling citations indicating that benzodiazepines are commonly prescribed to elderly people. (See "American Geriatrics Society 2015 updated Beers criteria for potentially inappropriate medication use in older adults. (J Am Geriatr Soc. 2015; 63: 2227-2246.); Olfson M., King M., Schoenbaum M.; Benzodiazepine use in the United States. (JAMA Psychiatry. 2015; 72: 136-142.); Benzodiazepine prescribing in older adults in U.S. ambulatory clinics and emergency departments (2001-10). (J Am Geriatr Soc. 2015; 63: 2074-2081.)," italics & fn. omitted.)

[substance] would be taken by any human being to his or her injury." (§ 347, subd. (a)(1).) This requires proof of two elements: first, that there was a cognizable injury, and second that the defendant should have known or actually did know the substance would injure the victim if consumed. This is similar to the requirement, discussed in more depth below, that to be guilty of assault with a deadly weapon the assailant must have " 'actual knowledge of the facts sufficient to establish that [her] act by its nature will probably and directly result in injury to another.' " (*B.M.*, *supra*, 6 Cal.5th at p. 534.)

Depending on the interpretation of the injury requirement, the prosecution here either failed to offer evidence of an injury or failed to offer evidence Peterson knew or should have known the poison would injure Maryann. This is because it's unclear whether section 347 requires that the poison itself must cause the injury, or whether any injury resulting from the poisoning might satisfy this element. If the former, there is simply no evidence here that the benzodiazepine harmed Maryann on its own. Indeed, the evidence presented was that the hospital found nothing wrong with Maryann and sent her home without any interventions the same day. Therefore, if the statute requires the poison or harmful substance cause the injury, there is simply no evidence of injury in this case.

But even assuming, for the sake of argument, section 347 applies anytime a defendant has some knowledge the poisoning will result in any injury, there is insufficient evidence Peterson had any knowledge or should have had any knowledge Maryann would be injured. The only injury Maryann suffered was the wound to her shin

13

which resulted from her falling several hours after she consumed the drug. But the prosecution presented no evidence Peterson knew or should have known such a fall or such an injury was a likely result of putting (some amount) of benzodiazepine in Maryanne's breakfast. Moreover Maryann fell after Sandra and Renee brought her back from the hospital—after several hours and multiple third-party interventions. We therefore conclude there was insufficient evidence to permit the court to find that at least one, and maybe even two of the elements of section 347 violation had been satisfied.

B.    *Assault with a Deadly Weapon*

In a similar vein, Peterson argues the record is insufficient to support the assault with a deadly weapon conviction because there was no evidence she used benzodiazepines (which are not deadly per se) in a deadly manner. Again, we agree.

Section 245, subdivision (a)(1), criminalizes "an assault upon the person of another with a deadly weapon or instrument other than a firearm." " 'As used in section 245, subdivision (a)(1), a "deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." ' " (*B.M.*, *supra*, 6 Cal.5th at pp. 532-533.) "Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citations.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the

14

nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1029.) "Objects which are not inherently dangerous but which have been found to be a deadly weapon include 'a pillow . . . ; an automobile . . . ; a large rock . . . ; a razor blade . . . ; [and] a fingernail file.' " (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1054.)

Much like how an otherwise benign substance can be a poison depending on how it is actually used, California law recognizes that an otherwise benign object may be used in such a way that it becomes an instrument of death or great bodily harm. Thus, the evidence supporting this conviction fails for the same reason the evidence supporting the poison conviction fails—we don't know how much of the drug is harmful to someone like Maryann and we don't know how much of the drug Peterson administered.

The People argue there is sufficient evidence to support this conviction because the benzodiazepine caused Maryann to fall and cut her shin after she returned from the hospital. According to the People, this means the amount Peterson administered was "capable of causing and likely to cause death or great bodily injury." (CALCRIM No. 875.) The prosecution did, at least, present evidence that benzodiazepines can cause dizziness or disorientation. At trial the detective testified that doctors are "told not to prescribe [benzodiazepines] to the elderly because it can cause a lot of problems, such as dizziness, falls, accidents." But this argument fails for the simple reason that the judge concluded the evidence was insufficient to support an inference that Maryann's fall was caused by an overdose of benzodiazepine.

Nor can the People point to evidence of *any* dose as evidence the drug was used as a deadly weapon. To begin with, therapeutic doses of medicine are definitionally not deadly weapons. More importantly, however, it is not enough that a claimed weapon be capable of producing death or injury; the manner in which it is used must be *likely* to produce death or great bodily injury. (*B.M.*, *supra*, 6 Cal.5th at pp. 532-533.) At best the evidence indicated that drugging Maryann made a fall *more* likely, not that it made it highly probable. Even assuming a fall was probable, though, there was little evidence that serious injury was a likely outcome. (*Ibid.*)

Finally, even accepting that any amount of a drug which produced dizziness was likely to cause Maryann serious injury or death, assault still requires the prosecution to prove Peterson had " 'actual knowledge of the facts sufficient to establish that [her] act by its nature will probably and directly result in injury to another.' " (*B.M.*, *supra*, 6 Cal.5th at p. 534.) There is no evidence in the record that Peterson had actual knowledge that drugging her mother would "probably and directly" result in Maryann's fall and injury hours later.

Accordingly, both the poisoning (count 1) and assault with a deadly weapon (count 4) convictions must be reversed for insufficient evidence.

Peterson also argues the judge erred in sentencing because he mistakenly concluded he lacked discretion to sentence Peterson to a concurrent term for her dissuading a witness conviction, and imposed fines and fees without determining whether Peterson had the ability to pay them. These arguments are moot given we are reversing

16

the principal term and remanding for full resentencing. On remand, Peterson is free to raise all sentencing and ability-to-pay issues.

### III.  DISPOSITION

We reverse for insufficient evidence the convictions for counts 1 and 4, and we remand to the trial court for resentencing on the remaining convictions.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

MILLER
Acting P. J.

RAPHAEL
J.