Filed 9/28/21  P. v. Pearce CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076942 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE378575) |
| ALEJANDRO PEARCE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and James H. Flaherty, III, Deputy Attorneys General for Plaintiff and Respondent.

Alejandro Pearce and Jordan Maxwell robbed Candido A. and in the process, one of them shot and killed him. The primary factual dispute at trial was whether Pearce or Maxwell was the shooter.

After Maxwell pleaded guilty to second degree murder, the People tried the case against Pearce on two alternative theories of first degree murder, either that: (1) Pearce was the shooter in a premeditated killing or during a robbery; or (2) Maxwell was the killer, and Pearce was liable on a felony murder theory as a major participant in the robbery who acted with reckless indifference to human life. (Pen. Code,[1] §§ 187, 189, subd. (e)(3).) The jury was also asked to determine if during the offenses Pearce "personally used" and/or "intentionally and personally discharged" a firearm. (§§ 12022.5, subd. (a), 12022.53, subds. (b)–(c).)

The jury found Pearce guilty of robbery and first degree murder, but deadlocked (eight to four, in favor of a true finding) on whether he personally used a gun. The court sentenced Pearce to state prison for 25 years to life.

On appeal, Pearce maintains that the jury's deadlock on the gun allegations necessarily means at least some jurors convicted him under a felony murder theory in which Maxwell was the shooter. With that premise, he contends the judgment should be reversed because there is insufficient evidence he was a major participant and acted with reckless indifference to human life.

In a supplemental brief, Pearce makes several additional assertions involving the "reckless indifference" element. Specifically, he contends (1) CALCRIM No. 540B as given was inadequate because it did not enumerate specific factors the jury should consider in making that

---

[1]     Statutory references are to the Penal Code.

2

determination, and which are now contained in a revised version of the instruction; (2) the court compounded that error by failing to sua sponte instruct that "participating in an armed robbery is insufficient, standing alone, to support a finding of reckless indifference to human life"; (3) alternatively, defense counsel rendered constitutionally ineffective assistance by not asking for such an instruction; and (4) the prosecutor misstated the law by telling the jury in closing argument that Pearce's role in the armed robbery was itself sufficient to demonstrate reckless indifference. In the event we deem this latter contention forfeited by counsel's failure to object, Pearce alternatively recasts the same claim as ineffective assistance of counsel. Finally, he contends the court erroneously denied him one day of presentence custody credit. We reject each of Pearce's arguments and affirm the judgment, without prejudice to his bringing a motion in the trial court to resolve a factual dispute involving the claimed one day extra custody credit.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Events Leading Up to the Shooting*

In mid-December 2017, Candido saw Pearce (19 years old) and Maxwell (age 17) smoking marijuana in a parked car near his house. Although Candido had never met them before, he told them he sold marijuana and gave his phone number for future purchases.

During the same time period, Pearce asked his girlfriend, M.S., to buy him a gun. M.S. promised to do so by Christmas, even if she had to steal the money. Pearce replied that their continued relationship depended on it.[2] A few days before Christmas, Pearce posted on social media a rap song about

_____

[2] The relationship was a committed one, at least from M.S.'s perspective. She has Pearce's name tattooed on her chest and his initials on her ring finger.

3

killing during a robbery.  The lyrics described "snatching lives from people" and shooting them full of holes, "like swiss cheese."

On December 27, 2017, Pearce and Maxwell arranged to meet Candido at a public library parking lot to buy an ounce of marijuana.  Candido's girlfriend, Angela, reluctantly drove him there in a small sedan.  Pearce and Maxwell met them on foot.  Maxwell got in the right-rear passenger seat, behind Candido.  Pearce sat behind Angela.  Unbeknownst to Candido and Angela, robbery was apparently part of their plan from the outset—neither of them had enough money ($160) to buy the ounce of marijuana.

Concerned about being seen making a drug deal outside the library, Angela drove to a more secluded area about five minutes away.  There, Candido handed an ounce bag to Maxwell, and they all shared a blunt.  At Candido's request, Angela drove them back to the library to drop off Maxwell and Pearce.  After she missed a turn, Pearce said that he and Maxwell lived nearby, and she could drop them off at the curb.

B. *Version One:  Evidence That Maxwell Was Actual Killer*

Angela pulled over and Candido asked Maxwell for the money.  Angela heard Maxwell say, "Give it to me" and next Angela heard Candido say, "What the fuck."  She looked to her right and saw Maxwell was "scooted forward" and pointing a gun near her head.  Angela screamed and ducked under the steering wheel.  Shots were fired.

Nearby residents heard two gunshots in rapid succession.  One described it as "pow pow."  Pearce and Maxwell fled on foot.

Candido was shot twice.  The first one hit the left side of his nose and then through his right hand, landing in the dashboard.  The fatal second shot

hit the back of his head, penetrating his brain and instantly incapacitating him.[3]

Angela did not see the gunshots. At the scene, she told police that " 'a little kid' " shot Candido from inside the car.[4] At trial, she described Maxwell as "a kid," 15 or 16 years old.

From text messages on Candido's phone setting up the drug deal, police located Maxwell and Pearce. At a photograph lineup, Angela identified Maxwell as the only shooter.[5] From a different lineup, she identified Pearce as the one sitting behind her.

The bullet that struck Candido's nose and hand was recovered from the airbag. However, police were unable to determine where the shot originated. A defense expert, however, testified that both shots were fired inside the car from the passenger-side rear seat (i.e., Maxwell's position).

C. *Version Two: Evidence That Pearce Was A Shooter*

A few minutes before the shooting, Tonya C. was in her parked truck when she saw a car pull up across from her with its headlights off. She heard a "faint" gunshot, and then saw someone exit the driver's side back seat with a gun and shoot into the car. She identified Pearce as the gunman.

The shooting occurred at about 6:50 p.m. Six minutes later, Pearce texted M.S., "I jus used my Christmas gift. I need you[;] can you get car plz." M.S. replied, "WTF happened?" Pearce said he would explain "face to face."

---

[3]    Because bullet fragments were so damaged, police could not determine if the bullet to the nose was fired from the same gun as the one to the head.

[4]    Maxwell is five foot, six inches tall; Pearce is five foot, eleven inches.

[5]    At trial, Angela testified that she did not know who fired the gun.

The next day (December 28), M.S. texted Pearce that police were at Maxwell's home. Two minutes later, Pearce replied, "Get my gift out now asap." He added, "MAKE SURE you clean it nobody like a dirty basketball." Later that night, M.S. replied, "It's gone forever." The gun used to kill Candido has never been found.[6]

## DISCUSSION

A. *The Court Did Not Err in Submitting Felony Murder to the Jury*

Section 189, subdivision (e) provides that a person who participated in an enumerated felony (including robbery) in which a death occurs may be convicted of first degree murder if one of the following three theories is proven beyond a reasonable doubt: "(1) The person was the actual killer[;] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, . . . or assisted the actual killer in the commission of murder in the first degree[;] [and] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." In this case, the court instructed the jury it could convict Pearce on two of these—(1) that he was the actual killer, or alternatively, (2) that Maxwell was the killer and Pearce was a major participant who acted with reckless indifference to human life (§ 189, subd. (e)(3)).[7]

Pearce does not challenge the sufficiency of the evidence to support his conviction under a theory that he was the shooter. Nor would such a

---

[6]     M.S. was charged with being an accessory after the fact (§ 32) and theft offenses. Before Pearce's trial, she pled guilty; the record does not indicate the specifics of her plea.

[7]     The court also instructed on first or second degree murder with malice aforethought.

challenge be successful. Tonya testified she saw him fire a gun into the car. And although the jury had ample grounds to discredit her account,[8] it was not inherently improbable. (See, e.g., *People v. Ontiveros* (1975) 46 Cal.App.3d 110, 116–117 ["even testimony which is subject to justifiable suspicion" may be substantial evidence if not inherently improbable (italics omitted)].)

But Pearce does challenge the sufficiency of the evidence to support his conviction under a felony murder theory in which Maxwell was the shooter. We would be required to reverse the judgment on that basis if Pearce establishes (1) error—that is, a lack of substantial evidence to support a conviction on that felony murder theory; and (2) resulting prejudice—"a reasonable probability that the jury in fact found [him] guilty solely on the unsupported theory." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130 (*Guiton*).) As explained below, we conclude there was no error, making it unnecessary to consider whether any error was prejudicial. " 'In evaluating a claim regarding the sufficiency of the evidence, we review the record "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citation.] ' "To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt." ' " (*People v. Bradley* (2021) 65 Cal.App.5th 1022,

---

8      Tonya admitted being "high on methamphetamine" and "pretty messed up" when witnessing the shooting. Moreover, the district attorney's office paid her rent, food, and utilities in exchange for her cooperation. She also has two felony convictions for forgery.

1028–1029 (*Bradley*).) " ' "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also be reasonably reconciled with a contrary finding." ' " (*Id.* at p. 1029.)

Substantial evidence supports a finding that Pearce was a major participant in the robbery within the meaning of section 189, subdivision (e)(3). To be a major participant, "a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder . . . ." (*People v. Banks* (2015) 61 Cal.4th 788, 802 (*Banks*).) To assist in determining whether a defendant was a major participant, *Banks* identified a nonexclusive list of factors that includes: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death?[ ] What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.) No one of these considerations is necessary, nor is any one of them necessarily sufficient.

Here, there is substantial evidence of nearly all of the *Banks* factors. The robbery was planned—Pearce brought a loaded gun to a drug deal when neither he nor Maxwell had enough money to pay for the marijuana. In his reply brief, Pearce concedes he "handed the gun to Maxwell at Maxwell's request, just as the decedent sought payment for his marijuana." Pearce had the opportunity to prevent the killing simply by keeping possession of his

gun. He not only gave Maxwell the murder weapon, but also instructed his girlfriend to clean and dispose of it afterwards.

As *Banks* did with respect to the major participant element, *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) provides a nonexclusive list of factors bearing on reckless indifference. In that case, the defendant planned a robbery of a computer store. During the robbery, one of the defendant's accomplices shot and killed the mother of a store employee who arrived at the store to pick up her son. At the time of the shooting, the defendant was not at the store, but he drove to the location shortly thereafter and fled when he saw a woman lying on the ground, the police approaching, and the shooter fleeing the scene. (*Id.* at p. 612.) Despite the evidence of the defendant's significant involvement in planning the robbery, there was also evidence that he tried to minimize the possibility for violence. He timed the robbery for after the store closed and there were not supposed to be bullets in the gun. (*Id.* at pp. 621–623.) The court concluded there was insufficient evidence of reckless indifference because "nothing in the plan . . . elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id.* at p. 622.)

In addition to considering the duration of the crime, *Clark* states relevant factors in determining reckless indifference are the defendant's (1) knowledge of weapons used in the crime, and their actual use and number; (2) presence at the crime and opportunities to stop the killing or aid the victim; (3) knowledge of the actual killer's propensity to kill; and (4) efforts to minimize the possibility of violence during the crime. (*Clark*, *supra*, 63 Cal.4th at pp. 618–622.)

9

Recently, the Supreme Court reiterated these factors in *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*). There, the defendant had been swindled out of several hundred dollars by the victim and sought revenge by having his friends " 'beat the shit' " out of the man and get the defendant's money back. (*Id.* at p. 671.) The plan did not call for the defendant to be at the scene, and there was no evidence that the plan involved using weapons. (*Ibid.*) But unknown to the defendant, one of the friends was armed and shot the victim. The defendant was not present during the shooting, and when he arrived at the scene afterwards he attended to the victim and cooperated with police. (*Id.* at pp. 671–672.) The Supreme Court determined that the defendant had not acted with reckless indifference because he was not present during the assault, his plan did not involve the use of weapons, the duration of the interaction was brief, and there was no evidence that the defendant knew his friends were likely to use lethal force. (*Id.* at pp. 671, 680–681.) "In short, a mastermind who planned a robbery and beating as revenge bore only minor culpability when his henchmen unpredictably went too far and shot the swindler to death." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 9.)

In this case, nearly all of the *Clark/Scoggins* factors support a finding that Pearce acted with reckless indifference to life. *Clark* states that "[a] defendant's *use* of a firearm, even if the defendant does not kill the victim . . . can be significant to the analysis of reckless indifference to human life." (*Clark, supra,* 63 Cal.4th at p. 618.) Here, Pearce was not merely aware that a gun would be involved in the robbery—rather, his rap video, posted on social media just a week before the killing, glorified murder occurring *during a robbery*. He obtained a gun a few days before the crimes, concealed it during the drug transaction, and handed it to Maxwell on his command so they could escape with the stolen marijuana.

10

Sidestepping this evidence, Pearce states that a defendant's "awareness that a confederate was armed, and that armed robberies carry a risk of death, is not enough to demonstrate reckless indifference." We agree. (*Banks*, *supra*, 61 Cal.4th at pp. 808–809.) The problem is that (1) Pearce himself was armed; and (2) his culpability goes well beyond mere awareness that an armed robbery was planned. The evidence would support a finding of intent to kill, and thus is necessarily sufficient to show reckless indifference to human life. Just a week before these crimes, Pearce boasted on social media that if anyone were to " 'Fuck wit us,' " he would shoot holes in that person like " 'swish cheese' " and he and his cohorts were " 'dem type' " who are "snatching lives from people" when " 'hittin licks' "—i.e., committing a robbery.[9]

Another factor supporting a finding of a reckless indifference to human life is the defendant's physical presence at the scene because that provides an opportunity to be a restraining influence and prevent the crime. (*Clark*, *supra*, 63 Cal.4th at p. 619.) Pearce asserts that although present the whole time, there is no evidence that he had "any opportunity to speak to Maxwell or attempt to dissuade him." We disagree. Pearce had the gun, and without it in Maxwell's hands there may have been no killing. At any point before Angela pulled over, including when he and Maxwell were sharing a blunt with the victim, Pearce could have decided to not give the gun to Maxwell.

---

[9] For these reasons, Pearce's reliance on *In re Ramirez* (2019) 32 Cal.App.5th 384, where the court found insufficient evidence of reckless indifference, is not a persuasive analogy. There, the defendant was the getaway driver, was not at the murder scene, and although he may have been able to see and hear what was happening at the time of the shooting, he was not close enough to exercise a restraining effect on the crime or his cohorts. (*Id.* at p. 405.)

11

The third *Clark* factor is the duration of the crime. Duration is relevant because when a victim is in the defendant's presence for a prolonged period, there is a greater opportunity for violence culminating in murder. (*Clark, supra*, 63 Cal.4th at p. 620.)

Pearce contends the "undisputed" evidence showed "the felony" lasted a matter of seconds. While that may be true, the relevant "duration" is not the few seconds to shoot and flee with the marijuana, but the entire encounter leading up to it. Pearce and Maxwell were with Candido for about 20 minutes. Although this is not an especially long period, it is enough to suggest the killing was not impulsive. (Compare with *Clark, supra*, 63 Cal.4th at pp. 537, 539, where the shooter was surprised by the arrival of a store employee's mother.)

As to the fourth *Clark* factor, nothing in the record indicates that Pearce was aware of Maxwell's propensity to kill. Nevertheless, this factor does not significantly assist Pearce. By supplying Maxwell with the loaded gun on demand, Pearce had a substantial role in the robbery.[10] (See *Tison v. Arizona* (1987) 481 U.S. 137, 153 ["the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life"].)[11]

---

[10]  In a related argument, Pearce asserts that he "had no criminal history and no history of engaging in any criminal misconduct with Maxwell." But that is not entirely true. When at arraignment the court asked whether Pearce has "a record," the prosecutor replied with this negative pregnant: "As an adult, no." Because Maxwell pled guilty before Pearce's trial, the record contains no information about his criminal history.

[11]  The terms "major participant" and "reckless indifference" in section 190.2, subdivision (d), which is incorporated by reference into the felony murder statute (§ 189, subd. (e)(3)), were designed to codify the holding of

Finally, that the jury could fairly conclude Pearce was a major participant is further supported by comparing the evidence here with cases where defendants have shown their culpability was too slight under *Banks* and *Clark*. Generally—and unlike Pearce—those defendants were not armed, not present for the shooting (either because they were getaway drivers or because they only planned the crime), and in some cases took steps to minimize the risk of violence. (See, e.g., *In re Miller* (2017) 14 Cal.App.5th 960, 965, 966–967, 974–975 [defendant planned the robbery, was the "spotter" who selected the robbery target, but was not at the scene of the robbery/murder, and did not know a gun would be used]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1019, 1023, 1025–1026 [defendant was involved in planning the robbery but was not at the scene of the murder, did not have reason to know it was going to happen, and could not do anything to stop the shooting]; *In re Taylor* (2019) 34 Cal.App.5th 543, 550 [defendant was getaway driver and not at the scene of the murder, did not supply the murder weapon, and planned the robbery in a way to reduce the risk of violence].)[12]

_____

*Tison*, and a prior decision upon which it is based. (See *Banks*, *supra*, 61 Cal.4th at p. 794.)

[12] Because of this disposition, it is unnecessary to address the Attorney General's alternative argument that the judgment can be sustained on a direct aiding and abetting theory, as well as Pearce's claim that the jury's deadlock on the gun enhancement demonstrates a reasonable probability that it convicted on the felony murder nonshooter theory.

B. *Giving the 2018 Version of CALCRIM No. 540B Was Not Error, and the Court Had No Sua Sponte Obligation to Further Explain "Reckless Indifference to Human Life."*

When this case was tried in 2018, the court gave the then-current version of CALCRIM No. 540B which provided in part:

> "To prove that the defendant is guilty of first degree murder under this theory, the people must prove that: [¶] . . . [¶]
>
> "6.  The defendant was a major participant in the Robbery and when the defendant participated in the robbery he acted with reckless indifference to human life.
>
> "A person *acts with reckless indifference to human life* when he knowingly engages in criminal activity that he knows involves a grave risk of death."

After Pearce's conviction, CALCRIM No. 540B was amended to incorporate *Clark*'s holding by offering a nonexclusive list of factors relevant in determining whether a nonkiller acted with reckless indifference.  As amended in April 2020, CALCRIM No. 540B provides in part:

> "[When you decide whether the defendant acted with *reckless indifference to human life*, consider all the evidence. No one of the following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant acted with reckless indifference to human life.  Among the factors you may consider are:
>
> "[• Did the defendant know that [a] lethal weapon[s] would be present during the <*insert underlying felony*>?]
>
> "[• Did the defendant know that [a] lethal weapon[s] (was/were) likely to be used?]
>
> "[• Did the defendant know that [a] lethal weapon[s] (was/were) used?]
>
> "[• Did the defendant know the number of weapons involved?]

"[• Was the defendant near the person(s) killed when the killing occurred?]

"[• Did the defendant have an opportunity to stop the killing or to help the victim(s)?]

"[• How long did the crime last?]

"[• Was the defendant aware of anything that would make a coparticipant likely to kill?]

"[• Did the defendant try to minimize the possibility of violence?]

"[• <insert any other relevant factors>]."  (Judicial Council of Cal. Crim. Jury Instns. (2020), CALCRIM No. 540B.)

Pearce characterizes these as "wholesale changes" that establish the prior version of CALCRIM No. 540B was "woefully inadequate" and, therefore, violated his due process rights.  We disagree.

Pearce's argument is foreclosed by *People v. Estrada* (1995) 11 Cal.4th 568.  There, the court held that "the generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance amply conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony.  [¶] . . . [¶]  This is the meaning intended by the phrase 'reckless indifference to human life' as it is used in section [190.2, subdivision] (d) . . . ."  (*Estrada*, at p. 578.)[13]

In this case, the trial court instructed with language almost identical to that suggested in *Estrada*.  It defined "reckless indifference to human life" as "knowingly engag[ing] in criminal activity that he knows involves a grave

___

[13]  The felony murder statute, section 189, subdivision (e), incorporates by reference the definition of "reckless indifference to human life" from section 190.2, subdivision (d).  (See *Bradley, supra,* 65 Cal.App.5th at p. 1030, fn. 6.)  Therefore, *Estrada* is equally applicable here.

risk of death." Thus, the reckless indifference to human life standard as defined by the trial court in its instruction is one the jury may reasonably be expected to understand without further amplification.

Further, contrary to Pearce's argument, the later revision to include *Clark* factors does not mean the version given in his case was constitutionally inadequate. (See *People v. Allison* (2020) 55 Cal.App.5th 449, 458 ["Jury instructions regarding the mental state required for a felony-murder . . . are not defective if they do not include the *Banks* and *Clark* factors."].) Rather, the additions in the revision reflect an attempt to minimize instances in which a finding of reckless indifference would later be determined to be insufficiently supported by the evidence. (See Bench Notes to CALCRIM No. 540B and *People v. Price* (2017) 8 Cal.App.5th 409, 451.)

This analysis also resolves Pearce's related contention that the court had a sua sponte obligation to instruct that the intent to commit an armed robbery or the mere fact of a defendant's awareness that a gun will be used in the felony is insufficient to support a finding of reckless indifference to human life. Because the phrase "reckless indifference to human life" does not have a technical meaning peculiar to the law, " 'the trial court had no sua sponte duty to further define the statutory phrase for the jury.' " (*Price, supra*, 8 Cal.App.5th at p. 444.)[14] Any clarifying comments would have amounted, at most, to a so-called "pinpoint" instruction that must be specifically requested. (See generally, e.g., *People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

---

[14] Because of this disposition, it is unnecessary to consider the Attorney General's argument that Pearce forfeited this issue.

C. *On Appeal, Pearce Cannot Sustain His Burden of Showing Counsel Was Constitutionally Ineffective in Failing to Request the Court Instruct That an Armed Robbery, Without More, is Insufficient to Show Reckless Indifference.*

Anticipating that we might conclude the trial court had no sua sponte obligation to amplify on CALCRIM No. 540B, Pearce alternatively contends defense counsel was constitutionally ineffective by not asking the court to instruct that participating in armed robbery, without more, is insufficient to constitute reckless indifference.

To establish ineffective assistance of counsel, a defendant bears the burden of showing that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms, and that absent counsel's error, it is reasonably probable that the verdict would have been more favorable. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1052–1053.) " 'If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation.' " (*Id.* at p. 1053.) "We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions" (*People v. Holt* (1997) 15 Cal.4th 619, 703), and will reverse on the ground of inadequate assistance of counsel only if the record affirmatively discloses that counsel had no rational tactical purpose for his act or omission (*People v. Zapien* (1993) 4 Cal.4th 929, 980).

Here, the record does not indicate why counsel did not ask for the instruction Pearce now claims was essential, nor is there any indication that counsel was asked for an explanation and failed to provide one. Thus, Pearce is in the difficult position of having to establish there could be no tactical reason for trial counsel to not request the additional instruction. And we can

17

conceive of at least one plausible reason why defense counsel might not want an instruction focusing the jury's attention on Pearce's role in the robbery: It would have been inconsistent with the defense theory that both the robbery *and* murder were unplanned and unforeseeable—the result of Maxwell's violence made possible only because Angela missed the turn to the library.

Moreover, in closing argument defense counsel told the jury that to convict on a felony murder theory, the jurors would have to conclude that Pearce was "up to his eyes in the robbery" and "he is the reason there was a robbery." Thus, defense counsel's closing argument ameliorated any possibility that jurors might otherwise believe Pearce's mere presence or participation in an armed robbery was enough to support a guilty verdict on a felony murder theory. Pearce's ineffective assistance claim therefore fails on appeal, and is more appropriately pursued, if at all, in a petition for writ of habeas corpus. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

D. *The Prosecutor Did Not Commit Misconduct in Closing Argument*

In rebuttal closing argument, the prosecutor addressed the felony murder theory if the jury concluded that Maxwell was the actual killer, explaining:

> "What awareness did the defendant have with the particular dangers posed by the nature of the crime? You heard about his rap lyric. He knows drug robberies are violent, can end up with people dying. Any weapons used? Everyone knows a gun is dangerous, especially when loaded like it is in this situation." [¶] . . . [¶]

> "Finally, did the defendant act with reckless [indifference] to human life? Once again, he is engaged in a robbery with a loaded gun with another person who also has a gun. And what does he do after the shot has been fired? He runs off."

Focusing on these remarks only, Pearce contends the prosecutor misstated the law by telling the jury "armed robbery = reckless indifference as a matter of law." [15]

It should go without saying that it is improper for the prosecutor to misstate the law in closing argument. (*People v. Marshall* (1996) 13 Cal.4th 799, 831.) In evaluating that claim, we review the prosecutor's entire argument as a whole. (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) Here, in portions of the argument Pearce does not mention, the prosecutor referred to evidence that Pearce planned the robbery *and* murder, supplied the murder weapon, was present at the scene, had an opportunity to stop Maxwell from shooting, did not render aid after the shooting, and fled. Although these remarks appear to have been directed towards explaining that Pearce was a "major participant," in *Clark* the Supreme Court explained that "reckless indifference to human life" "significantly overlap[s]" with the major participant element. (*Clark, supra,* 63 Cal.4th at pp. 614–615.) The prosecutor did not tell the jury that Pearce's participation in an armed robbery, all by itself, was enough to show reckless indifference. There was no misstatement of law.[16]

In a related argument, Pearce also contends that a note sent by the jury during deliberations shows the jury was confused about the reckless

---

[15]  Because Pearce's trial lawyer did not object, the issue is forfeited on appeal. (*People v. Brown* (2003) 31 Cal.4th 518, 553.) Nevertheless, because appellate counsel alternatively argues the failure to object is ineffective assistance, we address the merits in that context.

[16]  For the same reason, counsel was not constitutionally ineffective in failing to object during closing argument. (*People v. Thomas* (1992) 2 Cal.4th 489, 531 [failure to make meritless objection does not constitute ineffective assistance of counsel].)

indifference element in CALCRIM No. 540B. Some additional background will place this in a fuller context.

Late on a Friday afternoon and after two days of deliberations, the jury sent a note to the court asking, "Can we speak with the judge on Monday morning to help interpreting [CALCRIM No.] 540(B) & clarifying verdict forms?" At 9:07 a.m. on the following Monday, and after conferring with both counsel the court replied, "Please give us more information as to both questions." Twelve minutes later, the jury asked, "On the verdict form, do we all need to be unanimous on true/not true questions" and "[i]f we are not unanimous, how do we mark true/not true questions?" The jury did not ask any clarifying question about CALCRIM No. 540B. At 9:38 a.m., the court replied, "You do have to be unanimous, if you cannot be unanimous, do not mark either true or not true." At 9:55 a.m., the jury reached a verdict.

Pearce interprets these exchanges as showing the jury was confused about the felony murder instruction and reached a verdict with the confusion unaddressed and unresolved. We disagree. The court invited the jury to ask a question that would clarify exactly what part(s) of CALCRIM No. 540B was of concern. It never did. We know the jury was capable of and comfortable asking a follow up question—it did so with respect to the other question about the verdict form. The only reasonable conclusion is that after further deliberations that Monday morning, jurors determined no additional instruction or clarification of CALCRIM No. 540B was necessary.

E. *Whether Pearce is Entitled to One Additional Day of Custody Credit Must Be Determined in the Trial Court.*

The calculation of actual presentence custody credits is performed by simply adding together "all days of custody" the defendant has served. (*People v. Arevalo* (2018) 20 Cal.App.5th 821, 827.) Ordinarily, this is a simple exercise in using a calculator. In this case, however, the problem is

20

not whether the court made the correct computation, but rather a dispute about when to start counting custody days.

The "Criminal History" and the "Custody Data" sections of the probation report state Pearce was arrested on December 30, 2017. And at trial, the arresting officer testified he took Pearce into custody on December 30. But the "Background" in the "Offense" section of the probation report states Pearce was arrested a day earlier, on December 29, 2017. Unfortunately, this has become an appellate issue because no one called the discrepancy to the court's attention at sentencing.[17]

It is undisputed that Pearce was released from custody on January 4, 2018, arrested a second time on February 15, 2018, and remained in custody up to and including sentencing on November 22, 2019. Based on the December 30 date, the trial court calculated 652 days of presentence credit, consisting of 6 days (December 30 to and including January 4), plus 646 days (February 15, 2018 to and including November 22, 2019).

The Attorney General argues that the December 30 date is the correct one because it is consistent with the arresting officer's trial testimony, and the December 29 date appears only in the factual summary portion of the probation report, not the custody data section. The unstated assumption is that a date in the custody section is more credible than a conflicting date elsewhere in the same report. And while this analysis appears reasonable, nothing in the record forecloses the possibility that Pearce was actually

---

[17] Nevertheless, the issue is not forfeited. " 'A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered.' " (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 235 (*Cardenas*).)

arrested on December 29, and even someone sentenced to 25 years to life should not be imprisoned one day longer than is required by law.

The key question is the source of information, if any, for the probation officer's conflicting statements about the date of arrest. Without that, we are just speculating. And while we would ordinarily presume the probation officer fully and fairly performed the duty to correctly chronicle the dates a defendant was in custody (*Cardenas*, *supra*, 239 Cal.App.4th 220, 235), that presumption fails where the probation report itself is internally inconsistent on the critical start date.

Fortunately, there is an available process that will avoid any such speculation. Section 1237.1 provides that if an error in calculating presentencing custody credits is not discovered until after sentencing, the defendant is required to first make a motion in the trial court to correct the error:

> "No appeal shall be taken by the defendant from a judgment of conviction on the ground of an error in the calculation of presentence custody credits, unless the defendant first presents the claim in the trial court at the time of sentencing, or if the error is not discovered until after sentencing, the defendant first makes a motion for correction of the record in the trial court, which may be made informally in writing. *The trial court retains jurisdiction after a notice of appeal has been filed to correct any error in the calculation of presentence custody credits upon the defendant's request for correction.*" (Italics added.)

Notwithstanding the unequivocal language, " 'No appeal shall be taken . . . unless the defendant first presents the claim in the trial court,' " courts have interpreted this statute to not *require* a motion be filed in the trial court as a precondition to litigating the amount of presentence credits where other issues are raised on direct appeal. (*People v. Acosta* (1996) 48 Cal.App.4th 411, 420 (*Acosta*).) That makes a lot of sense where correcting

the error simply involves pressing the correct buttons on a calculator or counting days on a calendar. But where determining the correct presentence custody credit requires resolving a disputed factual issue—as here—clearly the trial court is in a better position than a reviewing court to access the records necessary to determine the appropriate award of credit.

*Acosta* "holds no more than that the Court of Appeal *may* address a question of this sort *if* it is properly presented with others as well. It does not even suggest that the Court of Appeal *must* do so . . . ." (*People v. Mendez* (1999) 19 Cal.4th 1084, 1101.) Given the unresolved factual dispute, we are unable to address Pearce's custody credit claim on appeal. We suspect this issue could be resolved by examining records of indisputable accuracy, and we encourage the parties to do so. If the People agree that Pearce is entitled to the extra day of credit, nothing in this opinion would preclude a stipulation to that effect and an order amending the judgment pursuant to that stipulation. But absent that, if he so chooses Pearce may file a motion under section 1237.1 in the trial court to resolve whether he was first arrested and confined on December 29 or December 30.[18]

_____

[18] In his supplemental brief, Pearce also contends he is entitled to 651 days of credit for the period of the second arrest starting on February 18, 2018 through and including November 22, 2018 (date of sentencing), whereas the trial court calculated 646 for the same period. On this issue, there is no dispute about the relevant dates, but only a counting exercise. We have done the math and agree with the trial court and the Attorney General—it should be 646 days, which the court awarded, not 651.

## DISPOSITION

The judgment is affirmed without prejudice to Pearce's filing a motion in the trial court under section 1237.1 to determine whether he was first arrested and confined on December 29, 2017, or instead on December 30, 2017. If the trial court determines that Pearce was first arrested and confined on December 29, 2017, it shall amend the judgment to add one day of presentence custody credit, and shall direct the clerk to prepare an amended abstract of judgment reflecting the additional one day of custody credit and forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is to remain unchanged.


DATO, Acting P. J.

WE CONCUR:


GUERRERO, J.


DO, J.

24