Filed 4/3/25  P. v. Tiebout CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOEMAR DARRELL TIEBOUT,<br><br>    Defendant and Appellant. | D082238<br><br><br>(Super. Ct. No. JCF005329) |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher J. Plourd, Judge.  Affirmed.

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Joemar Darrell Tiebout of shooting into an inhabited dwelling (count 2, Pen. Code § 246),[1] assault with a firearm (count 3, § 245, subd. (a)(2)), unlawful possession of ammunition (count 6; § 3035, subd. (a)(1)), and two counts of possession of a firearm by a felon (counts 4 and 5, § 29800, subd. (a)(1)). Tiebout admitted a prior strike and the trial court sentenced him to 11 years four months in prison.

Tiebout asserts the trial court violated the Racial Justice Act (RJA) (§ 745) when it stated that Tiebout, a black man, was "essentially living, what I'll refer to as the gangster life" during sentencing. To the extent we conclude, as the People suggest, that Tiebout forfeited this claim by failing to raise it in the trial court, he argues his trial attorney provided ineffective assistance as a result.

Tiebout also asserts guidance provided by the Legislature in Assembly Bill No. 600 (2023-2024 Reg. Sess.) (Assembly Bill 600) (Stats. 2023, ch. 446) requires the trial court to consider the mitigating circumstances enumerated in section 1385, subdivision (c) in deciding whether to strike a strike prior, and the matter must therefore be remanded to allow the trial court to reconsider its decision not to strike his strike prior.

Finally, Tiebout asserts, and the People concede, that the abstract of judgment must be amended to reflect an award of six additional custody credits.

We conclude Tiebout forfeited his claim under the RJA and has not established that his trial counsel provided ineffective assistance. We also reject his claim regarding the impact of Assembly Bill 600. Accordingly, we affirm the judgment as modified to account for the additional custody credits.

---

1    Further unspecified statutory references are to the Penal Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Evidence at Trial*

The jury convicted Tiebout on various charges stemming from two separate incidents that occurred at the same motel in El Centro, on August 15, 2021 and September 5, 2021, respectively.  On each occasion, the manager of the motel assisted the responding police officers in reviewing the video surveillance footage from outside the motel and making a recorded copy of that footage.  The People played the recorded videos for the jury at trial.

### 1.    August 15, 2021

On August 15, 2021, the police received a report concerning a fight and a broken window at the motel.  The motel manager reviewed the surveillance video and identified Tiebout as the individual who broke the window.

The video showed Tiebout engaging in an argument with a female in the parking lot.  Some male individuals emerge from one of the motel rooms to assist the female, but the female stands in front of Tiebout, protecting him from the other men.  Tiebout is then seen running to his car and pulling out a black bag.  As he pulls out the bag, something falls to the ground.  A police officer that reviewed the footage testified that he believed the object that fell was a magazine, designed to hold bullets for a gun.  The police recovered a live bullet from the ground in the area where the object fell.  In the video, Tiebout retrieves the object from the ground and appears to load it into a handgun.  Upon seeing this, the other individuals in the area flee.  Tiebout follows them into one of the motel rooms for a minute and then comes out, alone, and goes into a different room.

### 2.    September 5, 2021

On September 5, 2021, the police received a report of a gunshot being fired into an occupied motel room.  As with the previous incident, the motel

manager showed the police the surveillance video and identified Tiebout as the individual who fired the gun.

The surveillance video from September 5 shows Tiebout standing outside of a motel room. He bangs on the window and door of the room. The window breaks. Tiebout then looks towards the window and shoots a single bullet through a hole in the window.

L.H. was in the motel room. She said that Tiebout was yelling for her boyfriend's brother to come outside. She believed Tiebout was upset because he thought his girlfriend had cheated on him with this other individual. She recalled seeing a laser light on the center of her chest and looking out the window to see Tiebout aiming a gun through the window. She heard a single shot. She was not hit but blacked out after the bullet passed by her.

L.H. gave the police permission to search the motel room. They were able to identify the path of the bullet, through the window, through a sheet that was hanging like a curtain in the room, and then through a trash can and into the drywall near the bathroom. A police officer cut a hole in the drywall to investigate further. He found fragments that could have been from a bullet, and he therefore believed the bullet hit the back of the cast iron bathtub, causing it to disintegrate. Another officer found a bullet casing outside under the broken window.

### 3. Defense Case

Tiebout was arrested on September 5, 2021. The police did not conduct a gunshot residue test on Tiebout and did not recover any weapon from his possession.

Tiebout testified in his own defense. Tiebout admitted he was the individual in the surveillance videos but asserted he did not have a gun on either date. He claimed that he was being assaulted by two brothers during

4

the first incident, on August 15. He was still angry about this when he returned on September 5. One of the men involved in the assault was in the motel room and flashed a gun at Tiebout to provoke him. Tiebout banged on the door and window. He was trying to tell them to come out because "if you're going to flash a gun, use it." After a while, he left. Upon reviewing the video footage, Tiebout asserted it was a cellphone that he dropped by the car and a small retractable tire iron that he grabbed from the car on August 15, and that he was carrying a tactical flashlight that clipped to his pants on September 5.[2]

## B. *Verdict*

The jury acquitted Tiebout on one count of attempted murder, related to the shooting on September 5, 2021. The jury found Tiebout guilty of shooting at an inhabited dwelling, assault with a firearm, and possession of a firearm by a felon as related to the incident on September 5, 2021, and of being a felon in possession of a firearm and of possession of ammunition as related to the incident on August 15, 2021.

Thereafter, Tiebout admitted a prior conviction for shooting at an inhabited motel room in violation of section 246 from 2015, which qualified as a strike prior.

## C. *Sentencing*

Prior to sentencing, Tiebout requested, and the court appointed, new counsel. With the assistance of the new counsel, Tiebout filed a motion for a new trial, asserting his prior trial counsel had provided ineffective assistance

---

[2] The court later commented, in connection with a motion to reduce bail, that Tiebout "essentially perjured himself" during trial.

by not adequately communicating a plea offer and by making several critical errors in his defense throughout the trial.[3]  The trial court denied the motion.

Tiebout filed a statement in mitigation and asked the court to impose a total sentence of six years.  The probation department recommended the trial court sentence Tiebout to the middle term of five years on count 2, doubled to 10 years based on the strike prior, and further recommended that the trial court run all terms imposed on the remaining counts concurrently, for a total of 10 years.  The People did not file a statement in aggravation and submitted on the probation report.

The trial court sentenced Tiebout on May 31, 2023.  Before announcing the sentence, the court noted that it had read the probation report and statement in mitigation, that it had sat through the trial and post-trial motions, and that it was "very familiar with all the circumstances of the case."  The court then stated: "Mr. Tiebout has a significant record.  He did a prison term for the exact same thing, and he gets out and he essentially is living, what I'll refer to as the gangster life.  He's, uh, doing things at the hotel, and, uh, all of that and so forth."  The court then noted that the jury convicted Tiebout on counts 2 through 6 and that some of them were clearly subject to section 654.

The trial court determined count 2 was the primary offense, and sentenced Tiebout to the middle term of five years, doubled to 10 based on the strike prior.  In choosing the middle term, the court noted, "this case was tried before it was required that the aggravating factors, uh, had to be proven independently [but] I think the aggravating factors do outweigh the mitigating factors."  The court then sentenced Tiebout to one-third the middle

---

[3]    Tiebout does not raise any of these same claims on appeal.

6

term on count 4, felon in possession on August 15, for an additional one year four months, and ran that consecutively, for a total term of 11 years four months.[4]  The trial court imposed and stayed sentences on the remaining counts under section 654.

Tiebout filed a timely notice of appeal.

## DISCUSSION

Tiebout does not dispute the evidence or the underlying convictions on appeal.  He asserts the matter must be remanded for resentencing based on a violation of the RJA, and because of changes in the law related to the trial court's discretion to strike a strike prior.  We address each in turn and conclude that remand is not necessary.  We will, however, amend the abstract of judgment to include six additional days of presentence credit.

### A.    *Tiebout Forfeited His Claim Under the RJA*

Tiebout's primary contention is that the trial court violated the RJA by referring to him living "the gangster life" during the sentencing hearing.  The People assert Tiebout forfeited this argument by failing to raise it in the trial court.  Tiebout responds that the RJA expressly permits a defendant to raise a claim based on the trial record on direct appeal and, regardless, this court should exercise its discretion to reach the merits.  In the alternative, he asserts his trial counsel provided ineffective assistance of counsel by failing to make a motion under the RJA.

---

[4]    As discussed by counsel at the sentencing hearing, there is some discrepancy between the information and the verdict forms as to which of the two counts of felon in possession related to which day.  In announcing the sentence, the trial court specified that it was referring to the charge from August 15, and that it considered that it was a separate incident from count 2, which occurred on September 5.

7

### 1. Governing Law

"In enacting section 745 [commonly known as the RJA], the Legislature laudably declared its intention 'to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California. Implicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias. The intent of the Legislature is not to punish this type of bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system. It is the intent of the Legislature to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing. It is the intent of the Legislature to reject the conclusion that racial disparities within our criminal justice are inevitable, and to actively work to eradicate them.' (Stats. 2020, ch. 317, § 2, subd. (i).)" (*People v. Lashon* (2024) 98 Cal.App.5th 804, 809 (*Lashon*).)

To achieve this goal, section 745, subdivision (a)(1) and(2) provides, as relevant here:

> "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin. A violation is established if the defendant proves, by a preponderance of the evidence, any of the following:
>
> "(1) The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin.
>
> "(2) During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law

8

enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful."[5]

Section 745, subdivision (h)(4) defines " 'racially discriminatory language' " for purposes of the statute to mean:

"language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory."

Section 745, subdivision (b) provides the mechanism for defendants to raise RJA claims and, effective January 1, 2024, provides:

"A defendant may file a motion pursuant to this section, or a petition for writ of habeas corpus or a motion under Section 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a). For claims based on the trial record, a defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence. The defendant may also move to stay the appeal and request remand to the superior court to file a motion pursuant to this section. If the motion is based in whole or in part on conduct or statements by the judge, the judge shall disqualify themselves from any further proceedings under this section."

---

[5] Section 745, subdivision (a) includes two additional categories of RJA violations, not directly relevant here.

Because Tiebout is raising his RJA claim for the first time on appeal, we review the trial record to determine whether he has established a violation of the RJA by a preponderance of the evidence. (§ 745, subd. (a) [violations established "by a preponderance of the evidence"]; cf. *People v. Howard* (2024) 104 Cal.App.5th 625 [applying de novo standard to the trial court's legal conclusion defendant failed to carry his burden of making a prima facie showing].)

### 2. Forfeiture

The People assert that Tiebout forfeited his RJA claim by failing to raise it in a timely manner in the trial court.

They rely primarily on *Lashon,* in which the appellate court held "the long-standing procedural appellate rules governing forfeiture of issues" apply in the context of section 745, such that a defendant that has a meaningful opportunity but fails to raise an RJA claim in the trial court forfeits that claim on appeal. (*Lashon, supra,* 98 Cal.App.5th at pp. 809, 815–816; see also *People v. Corbi* (2024) 106 Cal.App.5th 25, 38–42 (*Corbi*) [agreeing with the analysis in *Lashon*].)

The court in *Lashon* explained: As originally enacted, on January 1, 2021, section 745, subdivision (b) allowed defendants to "seek relief by filing a motion in the trial court or, if judgment had been imposed, by filing a 'petition for habeas corpus, or a motion under section 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a).' (§ 745, subd. (b).)" (*Lashon, supra,* 98 Cal.App.5th at p. 810.) At that time, section 745 applied "only *prospectively* to cases in which judgment had not been entered prior to January 1, 2021 (Stats. 2020, ch. 317)." (*Lashon,* at p. 810.)

"In 2022, the Legislature amended the statute to provide that a section 745 motion shall be made in the trial court 'as soon as practicable upon the

10

defendant learning of [an] alleged violation,' and '[a] motion that is not timely may be deemed waived, in the discretion of the court.'  (§ 745, subd. (c); added by Stats. 2022, ch. 739, § 2.)"  (*Lashon, supra,* 98 Cal.App.5th at p. 812–813.)

The Legislature amended the statute again, "effective January 1, 2023, to provide for *retroactive* application to judgments that were not final."  (*Lashon, supra,* 98 Cal.App.5th at p. 810; Stats. 2022, ch. 739, § 2.)  The amended statute created a timeline for defendants to bring claims related to judgments entered before January 1, 2021.  (*Lashon,* at p. 810; Stats. 2022, ch. 739, § 2.)  Notably, though, it did not remove the waiver provision in section 745, subdivision (c).  (*Lashon,* at p. 813.)

"After retroactive application became possible," the Legislature modified section 745 once more, through Assembly Bill No. 1118 (Stats. 2023, ch. 464) (Assembly Bill 1118), effective January 1, 2024.  (*Lashon, supra,* 98 Cal.App.5th at p. 810.)  Section 745, subdivision (b) "now provides that postjudgment [RJA] claims based on the trial record may be raised on direct appeal from the conviction or sentence (including to cases with judgments entered before January 1, 2021)."  (*Lashon,* at p. 810.)  Current section 745, subdivision (b) states, "[f]or claims based on the trial record, a defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence," and allows a defendant to "move to stay the appeal and request remand to the superior court to file a motion pursuant to this section."  As the court in *Lashon* noted, it "does not state that a defendant may raise a section 745 claim on direct appeal *for the first time* and does not refer to the general appellate rules governing the preservation or forfeiture of claims presented on direct appeal."  (*Lashon,* at p. 810; § 745, subd. (b).)

Considering this history, and the fact that "the Legislature did not include any language indicating a section 745 claim could be presented on

11

direct appeal *for the first time*," the *Lashon* court determined RJA claims remain "subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court." (*Lashon, supra,* 98 Cal.App.5th at p. 812–815.)  More recently, in *Corbi* another panel of this court agreed with the analysis in *Lashon*.  (See *Corbi, supra*, 106 Cal.App.5th at p. 41.)  In doing so, the court in *Corbi* addressed additional arguments raised by the appellant there, urging the court not to follow *Lashon*.  (*Corbi,* at pp. 41–44.)

Tiebout asserts that *Lashon* and *Corbi* were wrongly decided and urges this court to reconsider the conclusions therein.  We have considered Tiebout's arguments to that effect, but nevertheless agree with the analysis in *Lashon* and *Corbi*.[6]

Tiebout's primary assertion appears to be that Assembly Bill 1118 would be "effectively a nullity" if we follow the interpretation in *Lashon* and *Corbi*.  Not so.  Under the amended statute, a defendant may bring a claim under the RJA on direct appeal—as opposed to bringing that claim through a motion in the trial court or a petition for habeas corpus—if the defendant did not have an adequate opportunity to raise the claim in the trial court in the first instance, or if the defendant did raise the claim in the trial court.  As just one example, a defendant that was sentenced before the RJA went into effect, but whose judgment is not yet final, in the sense that an appeal is still pending, may raise an RJA claim in the pending direct appeal.  (See, e.g. *People v. Stubblefield* (2024) 107 Cal.App.5th 896, 903, 912, fn. 7 [raising an

---

[6]  Tiebout's unopposed request that we take judicial notice of certain legislative history materials is hereby granted.  (See Evid. Code §§ 452, 459; Cal. Rules of Court, rule 8.252.)

RJA claim based on closing argument that occurred in 2020], review granted Mar. 12, 2025, S289152.)

In passing Assembly Bill 1118, the Legislature was addressing the question of "whether a defendant could pursue a postjudgment section 745 claim by avenues other than a petition for writ of habeas corpus or a section 1473.7 motion." (*Lashon, supra,* 98 Cal.App.5th at p. 812.) In answering that question in the affirmative, the Legislature declared that it may be more efficient to handle this type of RJA claim in the direct appeal, as opposed to requiring a separate habeas petition. (See Senate Com. on Public Safety, Analysis of Assem. Bill 1118 (2023–2024 Reg. Sess.) as amended May 18, 2023, June 6, 2023 hearing.) This makes sense for cases where the violation is apparent on the record, because there is no need to further develop the record through a petition for habeas corpus or further proceedings in the trial court. But that does not mean that normal forfeiture rules do not apply. It simply means that, where it is more efficient to do so, an appellant may raise an RJA claim, that has not been forfeited, on direct appeal.

For these reasons, we decline to reconsider the conclusion reached in *Lashon* and *Corbi*. Here, Tiebout had an adequate opportunity to present his claim in the trial court, immediately after the court made the statement about his living "the gangster life." He failed to do so and has therefore forfeited the claim on appeal.

Tiebout also asks this court to exercise its discretion to disregard the forfeiture. (See, e.g., *People v. Coleman* (2024) 98 Cal.App.5th 709, 720 (*Coleman*).) We decline to do so. Tiebout relies on *In re Sheena K.* (2007) 40 Cal.4th 875 to assert the California Supreme Court has encouraged courts to reach the merits where constitutional claims present pure questions of law on undisputed facts and argues that this is the case here. His assertion is belied

13

by the fact that he also argues, in the alternative, that this court should stay the appeal and remand the matter to the trial court to allow further evidence, such as testimony from a sociology expert regarding the alleged coded implications of the court's "gangster life" comment.[7]  As we explain, *post*, when read in context, the trial court's statement appears to be reflective of Tiebout's actions, and therefore does not present a facially apparent RJA violation or a "pure question of law on undisputed facts" as Tiebout contends. (See *In re Sheena K.,* at pp. 888–889.)

Recognizing this potential result, Tiebout asserts his trial counsel provided ineffective assistance of counsel by failing to raise an RJA claim in the trial court.  We turn to this claim next.

**B.**     ***Tiebout Has Not Established That His Trial Counsel Provided Ineffective Assistance***

To prove ineffective assistance of counsel, Tiebout must show his attorney performed below the standard of reasonableness under prevailing professional norms and that there is a reasonable probability the result would have been more favorable to him but for that substandard performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 686–688 (*Strickland*); *People v. Mayfield* (1993) 5 Cal.4th 142, 199.)  However, because the statutory RJA remedies are automatic, we need not conduct analysis of the evidence supporting guilt or a particular sentence to establish prejudice in this context.  (*People v. Simmons* (2023) 96 Cal.App. 5th 323, 337.)  We focus instead on whether there is a reasonable probability a motion under

---

[7]     We note that in discussing cases that have found forfeiture, Tiebout appears to concede that RJA claims that are not sufficiently clear from the record alone are not appropriate for direct appellate review.

section 745 would have been granted and whether trial counsel may have had a satisfactory explanation for failing to make the motion.

In that regard, we are mindful that "[i]neffective assistance of counsel claims are rarely cognizable on appeal," as we give deference to trial counsel's tactical choices and the record rarely provides information regarding trial counsel's strategy. (*People v. Silvey* (1997) 58 Cal.App.4th 1320, 1329; *Strickland, supra*, 466 U.S. at pp. 690–691; *People v. Wilson* (1992) 3 Cal.4th 926, 936.) Where the record is silent as to counsel's motivation, the court must reject an ineffective assistance of counsel claim "unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Tiebout asserts this is a case where there was "no conceivable tactical reason" for his trial counsel's failure to raise an RJA claim because the trial court's reference to him living "the gangster life" was a facially apparent violation of the RJA. We disagree.

Tiebout does not specifically identify which subdivision of the RJA the statement violated but does refer generally to subdivisions (a)(1) and (2), which, respectively, preclude the judge from exhibiting bias or animus based on race, and from using racially discriminatory language about the defendant's race. He then compares this case to *Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, in which members of this court determined the trial court erred by not considering the possibility that an officer's explanation that he couldn't tell the race of the occupants when initiating a traffic stop because they were wearing hoodies might have suggested implicit biases and/or assumptions about the race of the occupants (*id*. at p. 830), and asserts the violation is more apparent here. Finally, he contends "no expert

15

is needed to conclude that 'living the gangster life' means 'crime-loving black man.' "

"The RJA defines ' "[r]acially discriminatory language" ' to include 'racially charged or racially coded language' and 'language that compares the defendant to an animal . . .' (§ 745, subd., (h)(4).)  Such language may explicitly or implicitly appeal to racial biases and inject racism and unfairness into a defendant's trial." (*People v. Quintero* (2024) 107 Cal.App.5th 1060, 1077 (*Quintero*).)  "We recognize the extraordinary need to root out both explicit and implicit biases that infect the judicial system and that the RJA is an important tool to help achieve a more just judicial system." (*Coleman, supra,* 98 Cal.App.5th at p. 721.)  We also acknowledge "that determining what does and what does not constitute the exhibition of 'bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful,' may be a difficult task."  (*Ibid.*)

That said, while we do not dispute that possibility that the term "gangster" may be suggestive of race, or used in a racially charged manner, in certain contexts, the term itself appears to be race neutral.  Merriam-Webster defines "gangster" as "a member of a gang of criminals."  (Merriam-Webster Unabridged Dict. Online (2025).)[8]  Notably, Tiebout does not point us to any authority suggesting the term "gangster" is typically associated with a particular race, or otherwise denotes a "crime-loving black man."  At most, Tiebout mentions the popularity of the term "gangster rap," and quotes some language from the factual background of *People v. Coneal* (2019) 41 Cal.App.5th 951.  There, the court discussed the defendant's history of

---

[8]     (<http://unabridged.merriam-webster.com/unabridged/gangster> as of April 3, 2025, archived at <https://perma.cc/3VM9-CJY2>.)

rapping about "violence and the gang lifestyle," and the potential prejudice arising from the admissibility of rap lyrics unrelated to the charged offense. (*Id*. at p. 964.) There is no mention of race or the RJA. (*Ibid*.)

Here, it is apparent from the context of the trial court's comments that the court was using it as a reference to Tiebout's continued criminal behavior. Just before making the comment, the court noted that it had sat through the trial and was very familiar with the circumstances of the case. The court also noted that Tiebout had previously served a term in prison for the exact same offense, shooting into an inhabited motel room, and that after getting out of prison, he committed these additional offenses, involving a weapon, at the motel. The court did not refer to Tiebout as a "gangster" but noted he was living "what I'll refer to as the gangster life." Thus, while we acknowledge the potential for coded language, in this context, on its face, the court's statements appear to be related to Tiebout's repeated criminal activities, not his race.[9] In addition, as noted, the trial court presided over the entire trial and Tiebout does not point to a single additional statement or ruling suggesting the court harbored bias against him. While a single statement can certainly be sufficient, in this context, for the reasons we have already explained, we do not view this single statement as necessarily exhibiting explicit or implicit bias.

---

[9] Tiebout also notes the trial court imposed a sentence greater than recommended by the probation officer, but that is because the trial court decided to run one count from a different date consecutive rather than concurrent. Tiebout does not assert this was legal error. Neither the probation officer nor the prosecutor provided any justification for running the sentences on each of the counts that arose from a separate incident on a separate date (as opposed to the primary offense) concurrently.

17

In sum, Tiebout fails "to persuade us that had [his] counsel made a timely motion asserting that the [court] violated the RJA by using the term ["gangster"], the motion would have been granted. Thus, [he has] not established either the deficient performance or the resulting prejudice required to prevail on a claim of ineffective assistance of counsel." (*Quintero, supra,* 107 Cal.App.5th at p. 1078.) Moreover, under these circumstances, we cannot say there is no possible satisfactory explanation for his trial counsel's failure to bring a motion under the RJA. Counsel could have determined, as we have, that the statement was related to Tiebout's criminal background, and not his race and, thus, that there was no reason or benefit to raising an RJA motion.

C. *We Decline to Stay the Appeal and Remand the Matter*

Alternatively, Tiebout asks this court to stay the present appeal and remand the matter to the trial court so that he may develop a record as to his RJA claim. We decline to do so. For the reasons we have already discussed, we conclude that Tiebout forfeited the claim by failing to raise it in the trial court. This applies to a stay and remand as well. Regardless, Tiebout raises this alternative, rather summarily, in his brief. He has not filed a motion to stay and remand, nor does he provide any authority suggesting a stay and remand would be appropriate in this context. (See, e.g., *People v. Wilson* (2024) 16 Cal.5th 874, 961–962 [concluding defendant failed to establish good cause for staying appeal and remanding to trial court to address RJA]; *People v. Frazier* (2024) 16 Cal.5th 814, 822, fn. 3 [same].)

D. *Assembly Bill 600 Did Not Alter the Trial Court's Discretion to Strike the Strike Prior*

Tiebout asserts remand is also necessary to allow the trial court to reconsider its discretion to strike his prior strike consistent with recent

18

guidance from the Legislature in the legislative intent portion of Assembly Bill 600.

### 1.    Additional Background

As an initial matter, Tiebout concedes that he did not file a formal *Romero*[10] motion asking the trial court to dismiss his prior strike.  However, he asserts the trial court reached the issue on its own, when it stated:  "I've considered as to both count two and count four as to whether or not I should exercise my discretion and strike the strike.  I'm not [going to] do that as to either given all the circumstances of the case."  Because Tiebout did not file a formal motion, and there was therefore no argument, the record is limited as to what precisely the trial court considered when declining to strike the prior strike.  Regardless, absent an affirmative showing to the contrary, we presume a trial court understood and properly applied the law.  (*People v. Coddington* (2000) 23 Cal.4th 529, 644.).

### 2.    Amendments to Section 1385

In *Romero*, the California Supreme Court held that section 1385, subdivision (a) permits a trial court "on its own motion to strike prior felony conviction allegations in cases brought under the Three Strikes law." (*Romero, supra,* 13 Cal.4th at pp. 529–530.)

"In 2021, the Legislature enacted Senate Bill No. 81 (2021–2022 Reg. Sess.), . . . which amended section 1385 to specify factors that the trial court must consider when deciding whether to strike *enhancements* from a defendant's sentence in the interest of justice.  (Stats. 2021, ch. 721, § 1.)" (*People v. Sek* (2022) 74 Cal.App.5th 657, 674, italics added.)  Most notably,

---

10    See *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) [explaining a sentencing court's discretion to strike prior conviction allegations].

the amendments added section 1385, subdivision (c), making it mandatory for a trial court to dismiss certain enhancements. (*Sek,* at p. 674.) Section 1385, subdivision (c) now provides that "the court shall dismiss an enhancement if it is in the furtherance of justice to do so" and that "the presence of one or more [enumerated mitigating] circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(1), (2).)

Since these amendments, several courts have held that section 1385, subdivision (c) does not apply to the trial court's decision whether to strike a prior strike, because the Three Strikes law presents an alternative sentencing scheme, which is different than an enhancement. (See *People v. Serrano* (2024) 100 Cal.App.5th 1324, 1328; *People v. Olay* (2023) 98 Cal.App.5th 60, 67; *People v. Burke* (2023) 89 Cal.App.5th 237, 242 (*Burke*).)

More recently, the Legislature passed Assembly Bill 600 to amend section 1172.1. Section 1172.1 "provides an exception to the general rule that a trial court has no jurisdiction to resentence a defendant after execution of the original sentence, by authorizing a recall and resentencing procedure that may be invoked when, for example, the Secretary of the Department of Corrections and Rehabilitation recommends resentencing." (*People v. Dowdy* (2024) 107 Cal.App.5th 1, 10 (*Dowdy*).) Effective January 1, 2024, Assembly Bill 600 expanded this exception to allow a trial court discretion to resentence a defendant on its own motion when "applicable sentencing laws at the time of original sentencing are subsequently changed by new statutory authority or case law." (Pen. Code, § 1172.1, subd. (a)(1), as amended by Stats. 2023, ch. 446, § 2; see also *Dowdy*, at p. 10.)

As relevant here, in the uncodified preamble to Assembly Bill 600, the Legislature found and declared:

20

"(a) It is the intent of the Legislature that, in resentencing proceedings pursuant to Section 1172.1 of the Penal Code, all ameliorative laws and court decisions allowing discretionary relief should be applied regardless of the date of the offense or conviction.

"(b) It is the further intent of the Legislature that courts have full discretion in resentencing proceedings pursuant to Section 1172.1 of the Penal Code to reconsider past decisions to impose prior strikes. The list of factors considered in [*Romero*] is not exhaustive. Courts should consider Section 1385 of the Penal Code, postconviction factors, or any other evidence that continued incarceration is no longer in the interests of justice." (Stats. 2023, ch. 446, § 1, para. (b).)

Tiebout relies on the last sentence, suggesting that trial courts should consider section 1385, in addition to the factors listed in *Romero*, when resentencing a defendant pursuant to section 1172.1, to assert that trial courts must now consider the mitigating factors enumerated in section 1385 whenever it considers whether to strike a prior strike.

### 3.    Analysis

Whether the foregoing statement of intent in Assembly Bill 600 requires a trial court to consider the mitigating factors enumerated in section 1385, subdivision (c) whenever it considers whether to strike a prior strike is a question of statutory interpretation that we review de novo. (*Burke, supra,* 89 Cal.App.5th at p. 242.)

At least two other courts have rejected similar arguments. (See *Dowdy, supra*, 107 Cal.App.5th at p. 9 ["We join the chorus of appellate opinions rejecting these arguments"]; *People v. Dain* (2024) 99 Cal.App.5th 399, 410–411, review granted May 29, 2024, S283924.) As the court in *Dowdy* explained: "It is well established . . . that section 1385, subdivision (c) applies by its terms to a sentence 'enhancement,' but not to a sentence derived from

the alternative sentencing scheme of the Three Strikes law." (*Dowdy,* at p. 9.)  "For several reasons, the uncodified legislative intent pertinent to section 1172.1 does nothing to suggest that section 1385, subdivision (c) should apply when considering whether to strike a prior conviction under the Three Strikes law," when resentencing under a provision other than 1172.1. (*Dowdy,* at p. 10.)

First, "Assembly Bill 600 explicitly limited its declaration of intent to 'resentencing proceedings *pursuant to Section 1172.1 of the Penal Code.*' (Stats. 2023, ch. 446, § 1, subd. (b), italics added.)  Nothing in Assembly Bill 600 indicates that the declaration applies to all resentencings or all *Romero* motions." (*Dowdy, supra,* 107 Cal.App.5th at p. 11.)  Second, "Assembly Bill 600 expresses the Legislature's intent that trial courts have full 'discretion' to *reconsider past decisions* to impose prior strikes, that the list of 'factors' in *Romero* not be exhaustive, and that courts should consider section 1385 'or any other evidence that continued incarceration is no longer in the interests of justice.' " (*Dowdy,* at p. 11, italics added.)  "[I]t does not say that the 'great weight' afforded to mitigating circumstances under section 1385, subdivision (c) should be applied in all *Romero* motions." (*Dowdy,* at p. 11.)  "Third, even if the Legislature had harbored such an intent in drafting the uncodified preamble to section 1172.1, as a matter of law, Assembly Bill 600 cannot apply the section 1385, subdivision (c) mitigating factors to *Romero* motions in a way that alters the operation of the Three Strikes law," because doing so would improperly undermine a voter initiative. (*Dowdy,* at p. 12.)  We agree with the analysis in *Dowdy*.

As Tiebout concedes, "the Legislature could have explicitly said that the more liberal treatment of *Romero* motions it contemplated in judge-initiated recall under section 1172.1 applied to all *Romero* hearings."  It did

not.  Tiebout asserts it makes no sense for the Legislature to impose a different standard for addressing *Romero* motions in the context of section 1172.1 as opposed to all other pending (or past) *Romero* motions.  We disagree.  Assembly Bill 600 addresses a very specific scenario, where the trial court, on its own motion, wishes to recall a sentence it imposed because of subsequent changes to the sentencing law.  In that scenario, the Legislature has expressed an intent that the court have significant discretion in reconsidering its prior sentencing decisions.  Absent an express statement from the Legislature, we decline to extend the statement of the Legislature's intent in that narrow context to apply to all cases in which judgment has not yet become final.

Moreover, even if "the uncodified legislative intent in Assembly Bill 600 *was* sufficient to require the application of section 1385, subdivision (c) and its mitigating factors to *Romero* motions under section 1172.75," Tiebout has not demonstrated that the trial court failed to consider any mitigating factor here.  (See *Dowdy, supra,* 107 Cal.App.5th at p. 13.)  The only factors Tiebout identifies are that the prior strike conviction was more than five years old, and that he was 25 when he committed the prior offense.  Tiebout listed the age of the prior offense as a mitigating factor in his statement in mitigation, and the trial court stated it reviewed that statement.  However, as the trial court noted, he committed *the same* violation after being released from prison.  Given the trial court's remaining comments on the record, we are not persuaded that the trial court failed to consider the age of the prior conviction in declining to strike the prior strike.

For the foregoing reasons, we decline to remand the matter to the trial court for resentencing based on the trial court's discretion to strike the prior strike.

23

**E.** *Tiebout is Entitled to Six Additional Presentence Credits*

Tiebout contends, and the People concede, that he is entitled to an additional six days of presentence credits.

Tiebout was placed in custody on September 5, 2021, and sentenced on May 31, 2023. Accordingly, Tiebout was entitled to 634 actual days of custody credit and an additional 634 days of conduct credit, for a total of 1268 credits. (§§ 4019, subd. (f), 2900.5, subd. (a).) Due to an error in calculation, the abstract of judgment reflects only 631 days of each, for a total of 1262 credits.

This court has the authority to amend the abstract of judgment to reflect the correct number of credits. (See *People v. Cardenas* (2015) 239 Cal.App.4th 220, 235 [sentence that fails to award legally mandated custody credits is unauthorized and may be corrected at any time]; *People v. Duran* (1998) 67 Cal.App.4th 267, 270 [same].) We will therefore amend the judgment to reflect 634 actual credits and 634 local conduct credits, for a total of 1268 custody credits.

## DISPOSITION

The abstract of judgment shall be amended to reflect 634 actual credits and 634 local conduct credits, for a total of 1268 custody credits, and a certified copy of the amended abstract shall be sent to the Department of

Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

KELETY, J.

WE CONCUR:

DATO, Acting P. J.

DO, J.